[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-11926

_____

D.C. Docket Nos. 2:93-cv-01404-WHA-CSC,
2:96-cv-00554-WHA-CSC

RICKY KNIGHT,
FRANKLIN IRVIN, et al.,

Plaintiffs-Appellants,

THOMAS OTTER ADAMS,
suing individually and on behalf of a class of persons similarly situated,
BILLY TWO FEATHERS JONES,
suing individually and on behalf of a class of persons similarly situated, et al.,

Consol. Plaintiffs-Appellants,

versus

LESLIE THOMPSON,
in his individual capacity,
DONALD PARKER, et al.

Defendants-Appellees,

WILLIAM S. STRICKER,
ELLEN RUTH LEONARD, et al.
individually and in their official capacity,

Consol. Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(August 5, 2015)

Before HULL and ANDERSON, Circuit Judges, and SCHLESINGER[*], District Judge.

SCHLESINGER, District Judge:

Plaintiffs-Appellants (hereinafter "Plaintiffs") are male inmates in the custody of the Alabama Department of Corrections ("ADOC"). They wish to wear their hair unshorn in accordance with the dictates of their Native American religion, but an ADOC policy forbids them from doing so. Plaintiffs brought this suit against the ADOC and several other defendants (collectively "ADOC"), challenging the ADOC's hair-length policy on various constitutional grounds and under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq. The United States has intervened on Plaintiffs' behalf. After a full evidentiary hearing and bench trial, the District Court made several findings of fact and entered judgment in favor of the ADOC. Because the ADOC carried its RLUIPA burden to demonstrate that its hair-length policy is the least restrictive means of furthering its compelling governmental interests, we affirm.

---

[*]Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

## I.  BACKGROUND

The ADOC requires all male prison inmates to wear a "regular hair cut," defined as "off neck and ears."  Dkt. 471.  The ADOC does not grant any exemptions to this policy, religious or otherwise.  Dkt. 474 p. 146.  Plaintiffs seek a complete religion-based exemption to the male hair-length policy.[1]  Plaintiffs seek this exemption because wearing long hair is a central tenet of their religious faith.  No plaintiff is a maximum-security inmate.

### A.    Procedural History

This is the third time that this case has come before this Court.  Plaintiffs initially filed suit on November 24, 1993, challenging on various constitutional grounds and under the Religious Freedom Restoration Act ("RFRA") the ADOC's policies restricting hair length and prohibiting sweat lodge ceremonies.  After entry of summary judgment for the ADOC, Plaintiffs appealed to this Court.  Dkt. 218.  During that appeal's pendency, Congress responded to the Supreme Court's partial invalidation of the RFRA by enacting the RLUIPA, and this Court therefore remanded this case to allow Plaintiffs to amend their complaint.  Dkt. 235.  After Plaintiffs amended the complaint to add claims under the RLUIPA and the Parties

---

[1]Three of Plaintiffs seek, in the alternative, a more narrow exemption to wear a kouplock—a two-inch wide strip of hair beginning at the base of the skull and stretching down the back.  However, because Plaintiffs first raised their kouplock argument in their objections to the magistrate judge's report and recommendation, and because the District Court did not consider the kouplock argument when it ruled on the report and recommendation, Plaintiffs have waived the issue.  Williams v. McNeil, 557 F.3d 1287, 1291 (11th Cir. 2009) (district courts have discretion to decline to consider arguments that are not presented to the magistrate judge).

engaged in a brief period of additional discovery, the District Court again granted summary judgment to the ADOC.  Dkt. 317.

Plaintiffs appealed again, and this Court affirmed the judgment of the District Court as to all but Plaintiffs' hair-length restriction claims.  As to the hair-length claims, however, this Court concluded:

> [O]n the present record factual issues exist as to whether, <u>inter alia</u>, the defendants' total ban on the wearing of long hair and denial of an exemption to the plaintiffs based on their Native American religion is "the least restrictive means of furthering [the defendants'] compelling governmental interest[s]" in security, discipline, hygiene and safety within the prisons and in the public's safety in the event of escapes and alteration of appearances.  In addition, we note that the evidentiary record relating to the hair-length claims is over ten years old and that, in the intervening time, prison staffing and administration, prison safety and security, and the prison population in Alabama have changed.

<u>Lathan v. Thompson</u>, 251 F. App'x 665, 667 (11th Cir. 2007) (internal citation omitted, second and third alterations in original).  This Court, therefore, vacated the District Court's judgment as to the hair-length claims and remanded the case for a full evidentiary hearing and bench trial, "following which the district court shall make detailed findings of fact and conclusions of law."  <u>Id.</u>

## B.    The Evidentiary Hearing and Bench Trial on Remand

On remand, Magistrate Judge Charles S. Coody held an evidentiary hearing and bench trial.  Dkts. 471, 474-76.  Plaintiffs proffered undisputed testimony regarding the burden that the ADOC hair-length policy placed on their religious

4

practices.  They also presented undisputed testimony that a strong majority of U.S. jurisdictions permit inmates to wear long hair, either generally or as an accommodation for religious inmates.[2]  A witness for Plaintiffs skilled in the use of Photoshop, a computer program used to digitally alter images, testified that corrections officers could easily be trained to alter inmate images to assist in the identification of escaped long-haired inmates.  Finally, George Sullivan, Plaintiffs' main witness, testified that his tours and audits of 170 correctional facilities and extensive past employment experience in several prison systems that permit long hair led him to conclude that the ADOC does not need to deny religious exemptions to accomplish its stated goals for its short-hair policy.  In support of his conclusion, Sullivan opined that inmates have many other locations where they can more easily store contraband (e.g., socks, stitching areas in clothes, gloves, jackets, etc.), long hair does not impede inmate identification, and long hair does not pose any health risks if inmates follow basic hygiene procedures.  Dkt. 474 at pp. 121-38, 143-44; Dkt. 475 at pp. 6-29, 118-58; Dkt. 476 at pp. 7-9, 11-29.

The ADOC's witnesses nonetheless asserted that its policy is necessary to accomplish several compelling goals, including the prevention of contraband, facilitation of inmate identification (both during the usual course of prison business

---

[2]These jurisdictions are: the Federal Bureau of Prisons, the correctional systems of approximately 38 states, and the District of Columbia Department of Corrections.  Dkt. 475 at p. 133.

5

and after escapes), maintenance of good hygiene and health, and facilitation of prison discipline through uniformity.  Aside from figures demonstrating that Alabama's prisons have become increasingly over-crowded, under-funded, and under-staffed in recent years, the ADOC's witnesses offered little statistical evidence to support their claims.  But they did offer elucidating expert opinions, lay testimony, and anecdotal evidence based on their decades of combined experience as corrections officers.

For example, Warden Grantt Culliver testified that permitting long hair would slow the process of searching inmates for contraband, increase the risk that inmates could grab each other by the hair during fights, and give inmates an additional location to hide small items like handcuff keys on their person.  He also testified that granting religious exemptions to Native American inmates would erode discipline and likely cause the ADOC's over-worked staff to stop enforcing the policy against non-exempt inmates.  As to hygiene, Culliver recounted an incident in which an inmate developed a fungus on his scalp that remained hidden from view until his hair was cut.  Dkt. 474 at pp. 124-32, 144-46, 162-68.

Gwendolyn Mosley, institutional coordinator of the ADOC's southern region and past warden of various ADOC institutions, similarly testified that the hair-length restrictions reduce inmates' ability to hide contraband, assist inmate identification, reduce the time and difficulty of conducting shake-downs and

6

searches, and prevent inmates from pulling each other's hair during fights. She further testified that exempting only certain inmates from the policy would allow them to identify as a special group and form gangs, eroding order and control. Finally, like Warden Culliver, Mosley testified that the grooming policy promotes health and hygiene. Dkt. 475 at pp. 5-10, 16-38.

Warden Tony Patterson echoed many of Culliver's and Mosley's concerns about Plaintiffs' requested exemption from the short-hair policy. Patterson testified that the hair-length policy facilitates the detection of contraband and assists with prompt inmate identification, both during day-to-day operations and in the event of an escape. He further testified that a generally applicable policy with no exemptions fosters discipline, and if the ADOC were required to grant exemptions, officers would have trouble enforcing the policy due to the difficulty of readily identifying which inmates are entitled to the exemption. Finally, Patterson testified concerning a September 2008 escape of two inmates, whose subsequent capture was accomplished by distributing pictures of the inmates to the public. Dkt. 475 at pp. 92-97, 103-05.

However, it was Ronald Angelone, former director of several state prison systems, who provided the most thorough defense of the ADOC's hair length policy. While serving as the director of Virginia's then-chaotic prison system, Angelone had begun enforcing, in response to security and health concerns, an

7

exceptionless grooming policy for male inmates that required all haircuts to be one inch or shorter.[3] Angelone specified several reasons for why he chose to enforce the grooming policy, chief among which was the 1999 escape of a "very dangerous" Virginia prison inmate who had cut his hair to alter his appearance. The inmate was discovered three or four days after his escape, but the haircut had so significantly changed his appearance that Angelone would not have been able to identify him from the photograph that the prison released to local police departments. Angelone also testified that a review of institutional reports confirmed that inmates had hidden ice picks, handcuff keys, wires, bolts, and other contraband items in their hair. He further recounted one incident in which prison staff cut their hands on a hidden razor blade while searching an inmate's hair. Angelone testified that the short-hair policy reduced the time needed to search inmates, and inmates were aware that officers often will not run their hands through their hair for fear of sharp objects. Angelone further asserted that inmates can grab each other by the hair during fights, and non-exempt inmates might attack exempted inmates out of jealousy for their special long-hair privilege. Turning to the asserted health and hygiene hazards of long hair, he described an incident in which a black widow spider wove a nest in an inmate's dreadlocks, and he noted that long hair had also concealed some inmates' scalp sores, cysts, and tumors. In

---

[3]The policy had allowed female inmates to wear shoulder-length hair, however, on the rationale that they posed a lesser risk of violence and escape than male inmates.

8

sum, Angelone opined that his short-hair policy was a factor in his successful restoration of order and control in Virginia's prison system. Dkt. 475 at pp. 46-54, 64-68, 73-74.

Although the ADOC's witnesses combined to offer a strong defense of the short-hair policy, they did make several concessions on cross-examination. They admitted that the ADOC allows female inmates to wear shoulder-length hair. They also conceded that they had never worked in—or reviewed the policies of—prison systems that allow long hair, either generally or as a religious exemption. Finally, none of the ADOC's witnesses could point to any instances where an inmate had attacked an exempted long-haired inmate out of jealousy or grabbed long hair during a fight. Dkt. 475 at pp. 46-54, 64-68.

## C.    The District Court's Decision

After the evidentiary hearing and bench trial, Magistrate Judge Coody issued a report and recommendation ("R&R") that recommended entry of judgment in favor of the ADOC. Dkt. 530. On the basis of exhibits admitted during the trial and in accordance with this Court's directions on remand, the Magistrate Judge made several factual findings that painted the current context of this case. First, he found that in September 2008, the ADOC housed 25,303 inmates—almost 189% of the statewide design capacity of the ADOC's facilities. Second, he found that disciplinary actions increased by 62% in 2007 alone, and nearly 50% of the

9

ADOC's inmates were serving time for felonies against persons.  Third, he found that the ADOC's overcrowded prisons are also under-staffed and under-funded, with approximately one in every four correctional personnel positions remaining vacant.  Finally, he found that between 1997 and 2007, the number of admissions to the ADOC outpaced the number of releases by almost 5000 inmates each year, except for the years 2000 and 2004.

Judge Coody also made specific factual findings with regard to male inmates' hair length, resolving disputes largely in the ADOC's favor.  He found that inmates can use long hair to alter their appearances, long hair impedes the ability of officers to quickly identify inmates in the prisons, and inmates can use long hair to identify with special groups, including gangs.  Implementing a Photoshop program for logging and manipulating digital photographs of inmates would raise practical concerns of cost and training, he found, and in any event would not assist in the identification of inmates inside the prisons.  He further found that long hair provides an additional location for inmates to conceal weapons and contraband, and correctional officers risk injury from hidden weapons when searching long hair.  He also found that inmates can manipulate self-searches of their hair, and permitting inmates to have long hair would make searches for contraband more difficult and more lengthy.  In addition, he found that uniformity within the ADOC's institutions instills discipline and promotes order by allowing

officers to exercise control over inmates, and maintaining discipline and order is important because violence is prevalent in the ADOC's prisons.  He specifically found, quoting Mosley's conclusory testimony, that the inmates incarcerated in the ADOC today are "younger, bolder and meaner" than those of previous years.  He concluded that inmates can grab other inmates' long hair during fights.  All these security problems are worse for male inmates than female inmates, he found, because male facilities are more over-crowded than female facilities, and males pose greater security risks than females.  Finally, Judge Coody found that requiring inmates to keep their hair short enables corrections officers to more easily detect infections and infestations and prevent their proliferation.

As to his conclusions of law, Judge Coody concluded that the ADOC's hair-length policy substantially burdens Plaintiffs' religious exercise.  He went on to conclude, however, that the ADOC had carried its RLUIPA burden and shown that its hair-length policy is the least restrictive means of furthering its compelling interests in security, safety, control, order, uniformity, discipline, health, hygiene, sanitation, cost-containment, and reducing health care costs.  That conclusion was compelled, he reasoned, by this Court's decision in Harris v. Chapman, 97 F.3d 499 (11th Cir. 1996), which upheld a Florida Department of Corrections short-hair policy under the statutory predecessor to the RLUIPA.  Judge Coody additionally noted that several of our sister circuits have, in a variety of contexts, sustained

11

prison grooming regulations in the face of RLUIPA challenges.  Magistrate Judge Coody then rejected Plaintiffs' argument that the widespread adoption of permissive grooming policies in other jurisdictions should, by itself, invalidate the ADOC's grooming policy.  He reasoned that the practices of other jurisdictions are some evidence—but are by no means dispositive evidence—of the feasibility of less restrictive measures, and the Supreme Court has cautioned lower courts to defer to the reasoned judgments of prison officials when applying the RLUIPA.

The District Court adopted Magistrate Judge Coody's Report and Recommendation ("R&R") and overruled Plaintiffs' objections, noting that "context matters," "what happens in other prison systems is beside the point," and Judge Coody appropriately took into account staffing and funding shortages as part of the "context" of the case.  Dkt. 549 at pp. 2-3.  Furthermore, according to the District Court, Plaintiffs' heavy reliance on the practices of other jurisdictions mistakenly "decouple[s] deference [to prison officials] from [the RLUIPA's] least restrictive alternative" prong.  Id. at 2.  The District Court therefore adopted the R&R and entered judgment in favor of the ADOC.  Dkts. 549, 550.  Plaintiffs then initiated this appeal.  Dkt. 556.

## II.  STANDARDS OF REVIEW

We review the District Court's factual determinations for clear error and its legal conclusions de novo.  In particular, we will conduct a de novo review of the

12

District Court's overall legal determination that the ADOC's hair policy comports with the RLUIPA.  Cf. Lawson v. Singletary, 85 F.3d 502, 511-12 (11th Cir. 1996) ("Whether the Rule comports with [the Religious Freedom Restoration Act] is a pure question of law, and is subject to de novo review by this Court."); accord Hamilton v. Schriro, 74 F.3d 1545, 1552 (8th Cir. 1996); Hoevenaar v. Lazaroff, 422 F.3d 366, 368 (6th Cir. 2005); McRae v. Johnson, 261 F. App'x 554, 557 (4th Cir. 2008); United States v. Friday, 525 F.3d 938, 949 (10th Cir. 2008); Garner v. Kennedy, 713 F.3d 237, 242 (5th Cir. 2013).[4]

A factual finding is clearly erroneous "if the record lacks substantial evidence to support it" or we are otherwise "left with the impression it is not the truth and right of the case"—"a definite and firm conviction that a mistake has been committed."  Lincoln v. Bd. of Regents of Univ. Sys. of Georgia, 697 F.2d 928, 939-40 (11th Cir. 1983) (internal quotation marks omitted).  As to the weighing of evidence, a District Court may weigh competing expert testimony but may not arbitrarily ignore expert testimony; rather, "some reason must be objectively present for ignoring expert opinion testimony."  United States v. Hall,

---

[4]We acknowledge that Lawson identified a policy's validity under the statutory predecessor to the RLUIPA as a "pure question of law."  Lawson, 85 F.3d at 512.  In this appeal, however, Plaintiffs attack not only the District Court's overall legal determination that the ADOC's short-hair policy comports with the RLUIPA, but also the factual findings upon which the District Court rested its ultimate legal conclusion.  This appeal, therefore, presents a mixed question of law and fact, and we will review the District Court's factual findings for clear error and its application of the law to those facts de novo.  Accord Garner, 713 F.3d at 242; Hamilton, 74 F.3d at 1552; McRae, 261 F. App'x at 557; Fegans v. Norris, 537 F.3d 897, 905 & n.2 (8th Cir. 2008).

583 F.2d 1288, 1294 (5th Cir. 1978).[5]  In addition, an evidentiary error is harmless if it "had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict."  United States v. Dickerson, 248 F.3d 1036, 1048 (11th Cir. 2001) (internal quotation marks omitted).

### III.  DISCUSSION

**A.    The RLUIPA Standard**

Congress enacted the RLUIPA as a response to the Supreme Court's decisions in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), and City of Boerne v. Flores, 521 U.S. 507 (1997).  In Smith, the Court held that the Free Exercise Clause typically does not shield religiously motivated conduct from the burdens of generally applicable laws.  494 U.S. at 878-79.  Congress responded three years later by enacting the Religious Freedom Restoration Act ("RFRA").  In an effort to restore the level of protection that religious observances enjoyed before Smith, the RFRA commanded that "government"—including state and local governments—"shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless such a burden met a "compelling governmental interest" and "least restrictive means" test.  42 U.S.C. § 2000bb-1.  In Flores, the

---

[5]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Supreme Court declared the RFRA's application to the States unconstitutional because it exceeded Congress's Fourteenth Amendment enforcement power. 521 U.S. at 532-36.

Mindful of the adage "where there's a will, there's a way," Congress responded to Flores with the RLUIPA, predicating its enactment not only on its power to enforce the Fourteenth Amendment, but also on its Spending and Commerce powers. Less sweeping than the RFRA, the RLUIPA targets only two areas: land-use regulation and institutions that receive federal funds. Borrowing the RFRA standard almost entirely, with respect to its protection of institutionalized persons, the RLUIPA commands that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The Act broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." Id. § 2000cc-5(7)(A). Under the RLUIPA, the plaintiff bears the burden to prove that the challenged law, regulation, or practice substantially burdens his exercise of religion. Once a plaintiff has made this prima facie

15

showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest.  Id. § 2000cc-2(b); Smith v. Allen, 502 F.3d 1255, 1276 (11th Cir. 2007), abrogated on other grounds by Sossamon v. Texas, 131 S. Ct. 1651 (2011).

Although the RLUIPA protects, to a substantial degree, the religious observances of institutionalized persons, it does not give courts carte blanche to second guess the reasoned judgments of prison officials.  Indeed, while Congress enacted the RLUIPA to address the many "frivolous or arbitrary" barriers impeding institutionalized persons' religious exercise, it nevertheless anticipated that courts entertaining RLUIPA challenges "would accord 'due deference to the experience and expertise of prison and jail administrators.'"  Cutter v. Wilkinson, 544 U.S. 709, 716-17 (2005) (quoting 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy on the RLUIPA)).  The Supreme Court has cautioned that "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," and "an accommodation must be measured so that it does not override other significant interests."  Id. at 722.  The Court further instructed:

> We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns.  While the Act adopts a "compelling governmental interest" standard, context matters in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.  They

16

anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.

Id. at 722-23 (internal quotation marks and citations omitted). This deference is not, however, unlimited, and "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements." Rich v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 533 (11th Cir. 2013) (internal quotation marks omitted).

## B.    Application of the RLUIPA Standard to this Case

The ADOC does not dispute that its hair-length policy substantially burdens Plaintiffs' religious exercise, nor could it. Plaintiffs' expert on Native American spirituality offered extensive, undisputed testimony that long hair has great religious significance for many Native Americans, and each Plaintiff confirmed that his desire to wear unshorn hair stemmed from deep religious convictions. Plaintiffs' expert further gave an uncontradicted opinion that forcing Native Americans to cut their long hair would amount to an "assault on their sacredness." The sincerity of these firmly-held beliefs—and the gravity of preventing their exercise—should come as no surprise to anyone familiar with Biblical Scripture.[6]

---

[6] See, e.g., Judges 16:4-30 (chronicling Delilah's betrayal of Samson, the forced cutting of Samson's hair in contravention to his Nazirite vow, and Samson's subsequent destruction of the Philistine temple); Numbers 6:1-21 (describing the Nazirite vow, which included a promise to refrain from cutting one's hair unless it became defiled by a sudden death that occurred in the

17

It is also beyond dispute that the ADOC has compelling interests in security, discipline, hygiene, and safety within its prisons and in the public's safety in the event of escapes and alteration of appearances. Lathan, 251 F. App'x at 667. The crux of this appeal, then, is simply whether the ADOC's blanket short-hair policy furthers those goals and is the least restrictive means of doing so.

### i.    In Furtherance of a Compelling Governmental Interest

As to the first RLUIPA prong, Plaintiffs merely mount an attack on the District Court's factual findings and choice to credit the testimony of the ADOC's witnesses. This attack must surely fail, as the detailed record developed during the trial of this case amply supports the District Court's factual findings about the risks and costs associated with permitting male inmates to wear long hair. Ronald Angelone described specific incidents in which male inmates had used long hair to conceal weapons and contraband, as well as a situation in which a male inmate had cut his long hair to significantly change his appearance after a successful escape. Angelone further testified that prison staff have cut their hands on hidden razors when searching male inmates' long hair. In addition, Angelone and Grantt Culliver testified that long hair had concealed male inmates' fungus outbreaks, sores, cysts, and tumors, and even a spider's nest. The ADOC's witnesses also offered credible opinions, based on decades of combined correctional experience,

Nazirite's presence, and which entailed the shaving of one's head and sacrifice of the hair at the close of one's period of dedication).

18

that inmates can grab long hair during fights, long hair impedes the ability of prison staff to readily identify inmates inside the prison, and an exceptionless short-hair policy promotes order and discipline while removing a physical characteristic that inmates can use to form gangs. Plainly, the ADOC's witnesses offered more than simply "speculation, exaggerated fears, or post-hoc rationalizations." Rather, they offered a reasoned and fairly detailed explanation of how the ADOC's short-hair policy addresses genuine security, discipline, hygiene, and safety concerns.

Plaintiffs point out that their witnesses offered competing testimony, but the District Court, as the finder of fact, remained free to reject it. We cannot say that the District Court clearly erred in its material factual findings with regard to male inmate hair-length.[7] Nor can we say that it arbitrarily ignored the testimony of Plaintiffs' expert when the ADOC's witnesses contradicted his testimony.[8] Given the District Court's factual findings, it is apparent that the ADOC's short-hair

---

[7]Plaintiffs direct their most vociferous objection toward the District Court's somewhat conclusory finding that the ADOC's current inmate population is "younger, bolder and meaner" than in previous years. We cannot say that this finding was wholly unsupported by the record, since the District Court also found that disciplinary actions increased markedly in 2007. But to the extent that the record was insufficient to support this particular factual finding, the error was harmless because it had no substantial influence on the outcome and sufficient evidence uninfected by error supports the District Court's determination that the ADOC's policy furthers compelling governmental interests. Dickerson, 248 F.3d at 1048.

[8]As the ADOC points out in its brief, the District Court may have chosen to discredit George Sullivan's testimony because he has testified in many prisoner religious rights cases, but never on behalf of a prison system, and because he admitted a lack of familiarity with the ADOC's prisons.

19

policy furthers its compelling interests in security, discipline, hygiene, and safety within its prisons and in the public's safety in the event of escapes and alteration of appearances.

###    ii.    Least Restrictive Means of Furthering the Interest

Plaintiffs cannot prevail on their RLUIPA claim because the ADOC has shown that its exceptionless short-hair policy for male inmates is the least restrictive means of furthering the compelling governmental interests that we have mentioned.  The ADOC has shown that Plaintiffs' proposed alternative—allowing an exemption for Native American inmates, requiring exempted inmates to search their own hair, and using a computer program to manipulate inmate photographs— does not eliminate the ADOC's security, discipline, hygiene, and safety concerns. As the District Court found, inmates can manipulate searches of their own hair to conceal weapons and contraband, and using a computer program to alter photographs does nothing to address the impediments that long hair causes for the identification of inmates within the prisons.

Alternatively, even assuming that the proposed alternative could eliminate the ADOC's concerns as to concealment of weapons and contraband and inmate identification, Plaintiffs' proposed alternative does nothing to assuage the ADOC's concerns about gang-formation and hair-pulling during fights, or the concealment of infections and infestations.  Thus, based on these concerns, the ADOC has

20

shown, at the very least, that its short-hair policy, as applied to Plaintiffs, is the least restrictive means of furthering its compelling interests in safety and hygiene. Plaintiffs cannot point to a less restrictive alternative that accomplishes the ADOC's compelling goals, and neither can we. The ADOC has carried its burden on both RLUIPA prongs.

We agree with the District Court that Harris v. Chapman, 97 F.3d 499 (11th Cir. 1996), compels the foregoing analysis. In Harris, this Court confronted a Rastafarian inmate's RFRA challenge to the Florida DOC's grooming policy, which, like the policy at-issue here, categorically forbade male inmates from wearing long hair.[9] This Court upheld the short-hair policy, reasoning in regards to the first RFRA prong that "[i]t is well established that states have a compelling interest in security and order within their prisons," and "[t]his general interest in security clearly includes other specific interests . . . such as the identification of escapees and the prevention of the secreting of contraband or weapons in hair or beards." Id. at 504. This Court then held that "a reasonable hair length regulation satisfies the least restrictive means test" because neither we nor the plaintiff could conceive of any lesser means that would satisfy these compelling interests. Id. So it is in this case. Plaintiffs have not presented any less restrictive alternative that can adequately contain the risks associated with long hair; they have merely argued

---

[9]As already mentioned, the RLUIPA essentially borrowed the RFRA standard, and the reasoning in Harris therefore applies with equal force in the RLUIPA context.

that the ADOC should volunteer to assume those risks.  The RLUIPA places upon the ADOC no such duty.

In response, Plaintiffs make three arguments that are worth addressing. First, they argue that the ADOC has failed to satisfy the "least restrictive means" standard because all its witnesses admitted that the ADOC never considered any less restrictive alternatives to its short-hair policy before adopting it.  Second, Plaintiffs argue that the widespread adoption of permissive grooming policies in other jurisdictions demonstrates the viability of a religious exemption as a less restrictive alternative.  Third, Plaintiffs argue that the ADOC's choice to allow female inmates to wear shoulder-length hair proves that it is able to accommodate their requested religious exemption. All of these arguments are unavailing, and we respond to them in turn.

It is true, as Plaintiffs point out, that some of our sister courts have focused on the RLUIPA's command that prison administrators "demonstrate" the lawfulness of their policies and have held that notwithstanding Cutter's deference mandate, prison administrators must show that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice."  See, e.g., Warsoldier v. Woodford, 418 F.3d 989, 999 (9th Cir. 2005); Spratt v. Rhode Island Dep't of Corr., 482 F.3d 33, 41 (1st Cir. 2007) (adopting Warsoldier's heightened proof requirement); Washington v. Klem, 497 F.3d 272,

22

284 (3d Cir. 2007) (same). This, however, is not the law in this circuit, and none of this Court's cases have adopted Warsoldier's more strict proof requirement. The language of the RLUIPA directs us to inquire merely whether the policy under review is the least restrictive means of furthering a compelling governmental interest. It is certainly possible—though perhaps relatively less common—for prison administrators to promulgate an appropriately tailored policy without first considering and rejecting the efficacy of less restrictive measures. The RLUIPA asks only whether efficacious less restrictive measures actually exist, not whether the defendant considered alternatives to its policy. As already explained, the ADOC has shown that no efficacious less restrictive measures exist and has therefore carried its RLUIPA burden.

Plaintiffs' heavy fixation on the policies of other jurisdictions similarly misses the mark. While the practices of other institutions are relevant to the RLUIPA analysis, they are not controlling—the RLUIPA does not pit institutions against one another in a race to the top of the risk-tolerance or cost-absorption ladder. See Rich v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 534 (11th Cir. 2013) (practices of other institutions are relevant but not controlling); see also Daker v. Wetherington, 469 F. Supp. 2d 1231, 1239 (N.D. Ga. 2007) (interpreting the RLUIPA to leave "room for a particular prison to decline to join the 'lowest common denominator' when, in the discretion of its officials, the removal of a

challenged restriction poses an appreciable risk to security"). The ADOC has shown that Plaintiffs' requested exemption poses actual security, discipline, hygiene, and safety risks. That other jurisdictions choose to allow male inmates to wear long hair shows only that they have elected to absorb those risks. The RLUIPA does not force institutions to follow the practices of their less risk-averse neighbors, so long as they can prove that they have employed the least restrictive means of furthering the compelling interests that they have chosen to address. The ADOC has shown that its departure from the practices of other jurisdictions stems not from a stubborn refusal to accept a workable alternative, but rather from a calculated decision not to absorb the added risks that its fellow institutions have chosen to tolerate. This cannot amount to an RLUIPA violation.

Finally, Plaintiffs' focus on the ADOC's different grooming standards for female inmates ignores the District Court's factual finding—supported by Ronald Angelone's testimony—that men pose greater safety and security risks than women in prison populations. We are not the first court of appeals to uphold a grooming policy that treats male and female inmates differently when the record shows that there are valid reasons for the different treatment. See, e.g., Fegans v. Norris, 537 F.3d 897, 905 (8th Cir. 2008). Given the District Court's finding that male inmates pose a greater threat than female inmates, the RLUIPA does not require the ADOC to enforce a sex-blind hair-length policy.

24

## C.    Plaintiffs' Additional Legal Rights

In a mere two pages at the end of their initial brief, Plaintiffs assert that the ADOC's hair-length restrictions violate their "additional legal rights." Specifically, Plaintiffs claim that the ADOC's hair-length policy violates their free exercise and freedom of association rights under the First Amendment, their constitutional rights to due process and equal protection of the laws, the Establishment Clause of the First Amendment, and their rights under 42 U.S.C. § 1985.  Except for their equal protection claim, Plaintiffs provide no supporting discussion and have therefore abandoned these additional issues in this appeal.  See Rowe v. Schreiber, 139 F.3d 1381, 1382 n.1 (11th Cir. 1998) (issues mentioned in passing but without supporting argument or discussion are abandoned).

Plaintiffs do present a cursory equal protection argument, but it is wholly meritless.  Plaintiffs claim that the ADOC's hair-length policy treats them differently than other inmates on the basis of race, religion, and sex.  There is absolutely no evidence in the record to support the contention that the hair-length policy—which applies to all male inmates without exception—discriminates on the basis of race or religion.  Furthermore, while the policy does establish different standards for male and female inmates, the record unmistakably shows that the ADOC has valid reasons for the different hair-length standards and the regulations are not arbitrary or unreasonable.  See Hill v. Estelle, 537 F.2d 214, 215-16 (5th

25

Cir. 1976) (upholding differential prison grooming regulations against an equal protection challenge because "[t]he disparity between the regulations for male and female inmates is not so grievous as to make them arbitrary or unreasonable, cruel or unusual, and the wisdom of the disparate regulations will be left to the judgment of state penologists"); accord Fegans, 537 F.3d at 906 (upholding differential prison grooming regulations against an equal protection challenge under a "reasonableness" standard).

## IV. CONCLUSION

In the end, Plaintiffs ask us to hold that because many other prison systems have chosen to accept the costs and risks associated with long hair, the ADOC must accept them as well. This we cannot do. Although many well-run institutions have indeed decided that the benefits of giving inmates more freedom in personal grooming outweigh the disadvantages, the RLUIPA does not prevent the ADOC from making its own reasoned assessment. Allowing male inmates to wear long hair carries with it established costs and risks, and the RLUIPA does not require the ADOC to embrace them merely because other institutions have.

The ADOC may, of course, decide in the future that these costs and risks might be worth absorbing, especially in view of the high value that long hair holds for many religious inmates. And the ADOC might also find persuasive James Madison's admonition that "[i]t is the duty of every man to render to the Creator

26

such homage and such only as he believes to be acceptable to him," and "[t]his duty is precedent, both in order of time and in degree of obligation, to the claims of Civil Society."  James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), in 5 THE FOUNDERS' CONSTITUTION, at 82 (Philip B. Kurland & Ralph Lerner eds., 1987).  But that is a decision that the RLUIPA leaves to the discretion of the ADOC's policy-makers.

For the foregoing reasons, the judgment of the District Court is

**AFFIRMED**.