[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14117

_____

D.C. Docket No. 1:12-cv-22958-PAS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
FLORIDA DEPARTMENT OF CORRECTIONS

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 14, 2016)

Before WILLIAM PRYOR and JILL PRYOR, Circuit Judges, and STORY,[*]
District Judge.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable Richard W. Story, United States District Judge for the Northern District of Georgia,
sitting by designation.

This appeal requires us to decide whether the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, prevents the Secretary of the Florida Department of Corrections from denying kosher meals to inmates whose sincere religious beliefs require them to keep kosher. After the United States sued the Secretary to compel the Department to provide kosher meals, but before the entry of an injunction, the Secretary voluntarily created a religious diet program. Even so, the Secretary continues to insist that the Department need not provide kosher meals because denying them is the least restrictive means of furthering a compelling governmental interest in containing costs. But the Secretary's argument lacks any support in the record. We affirm the summary judgment for the United States and the permanent injunction requiring the Secretary to provide kosher meals to the inmates.

## I. BACKGROUND

Since the 1990s, the Florida Department of Corrections has offered inmates regular meals, meatless meals, and vegan meals. It began offering kosher meals in 2004, but it stopped in 2007. It resumed offering kosher meals in 2010, but only as part of a pilot program at one facility.

In 2011, the Civil Rights Division of the United States Department of Justice opened an investigation into the denial of kosher food by the Department of Corrections. At the time, the Department of Corrections offered regular, vegan,

2

meatless, medical, and therapeutic options to prisoners outside of the pilot program. None of these diets satisfied the most orthodox version of the laws of kashrut, which prohibit certain food, such as pork, and "demand that food be stored, prepared, and served in a certain manner." *Moussazadeh v. Tex. Dep't of Criminal Justice*, 703 F.3d 781, 786 (5th Cir. 2012). The only choice for prisoners outside the pilot program with these religious obligations was, in the words of one prisoner, to "d[o] what a hungry man does, and pray[] for understanding."

In 2012, the Civil Rights Division concluded that the Department of Corrections was violating the Religious Land Use and Institutionalized Persons Act and asked the Secretary to comply. The Secretary refused, and the United States sued for declaratory and injunctive relief in August 2012.

In March 2013, the Secretary issued Procedure 503.006, which created a religious diet program. The program offered inmates three choices: the existing non-meat option, the existing vegan option, and a new kosher certified food option for inmates for whom "no other meal option offered by the Department . . . is capable of meeting the diet requirements of that inmate's professed religious faith."

The certified food option initially used "nationally recognized, religiously certified prepackaged processed foods." In October 2013, the Secretary revised the certified food option to allow "a standardized menu prepared in accordance with

3

religious dietary guidelines in a dedicated work area established exclusively for preparation of certified food option meals." In February 2014, the Secretary again revised the certified food option to allow "meals utilizing food items served in their natural state." The certified food option now consists of peanut butter, cereal, bread, sardines, cabbage, beans, carrots, crackers, and "an occasional piece of fruit," all served cold.

The religious diet program initially had several policies that limited admission and continued participation. The application tested prisoners' sincerity by asking them to cite "specific law(s) connected to your belief or faith that require(s) you to eat a religious diet" and by creating a waiting period for admission to the Program. The rules provided for the removal of an inmate "who misses ten percent (10%) or more of her/his CFO meals within a month" (the ten-percent rule), who "is discovered purchasing, possessing, or consuming food from the canteen or other source that violates the religious diet requirements" (the zero-tolerance rule), or who barters kosher food for non-kosher food (the anti-bartering rule). A prisoner could challenge his removal from the religious diet program, but he would have to eat from the mainline during the grievance process, which could last up to 30 days.

In April 2013, the United States moved for a preliminary injunction ordering the Secretary to provide a certified kosher diet to all inmates with a sincere

4

religious basis for keeping kosher. The United States also asked the district court to enjoin the religious diet program to the extent that it violated the Religious Land Use and Institutionalized Persons Act.

In December 2013, the district court entered a preliminary injunction that ordered the Secretary to provide kosher meals. The district court also prohibited enforcement of the waiting period, the doctrinal sincerity testing, the ten-percent rule, and the zero-tolerance rule. The parties and the district court later agreed to modified versions of the ten-percent rule and the zero-tolerance rule. We vacated the injunction in 2015 because the district court failed to make certain findings required by the Prison Litigation Reform Act. *See United States v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1223, 1228–30 (11th Cir. 2015).

Meanwhile, the Department continued to implement the religious diet program. The certified food option began at one facility in July 2013, and the Department provided the option at all facilities by April 2015. As of March 2015, the Department had approved 9,543 prisoners out of a total population of over 100,000. But participation rates at individual institutions declined over time, in part because prisoners without sincere religious beliefs tired of the repetitive and cold meals.

Enforcement of the modified rules limiting participation in the program has been uneven. A food director employed by the Department testified that enrolled

5

prisoners collected only 15 percent of their kosher meals overall one month, but the food director also testified that he was unaware of any prisoners being removed for eating from the mainline. A chaplain employed by the Department testified that he helps prisoners identify religious reasons for participating and that he has not suspended or removed prisoners for eating non-kosher food from the canteen. The chaplaincy administrator testified that he instructed chaplains not to remove prisoners who eat from the mainline and that he had no knowledge of such a removal. And a food service worker employed by the Department testified that the central office instructed him to stop suspending prisoners from the program.

The United States estimates a future annual cost of $384,400 for the program, but the Secretary estimates a future annual cost as high as $12.3 million. The United States uses a lower estimate of how many prisoners will participate and how often prisoners will skip meals. The parties also disagree about how to allocate the cost of staff and equipment assigned to both the program and the mainline.

Assuming that no prisoners skip meals, the certified food option costs $3.55 per prisoner per day, the mainline option costs $1.89 per prisoner per day, the vegan option costs $2.04 per prisoner per day, and the medical and therapeutic diets cost between $2.00 and $3.05 per prisoner per day. Participants in the mainline option eat 85 percent of their meals, and participants in the certified food

6

option eat 75 percent of their meals. The Department reduces its cost for the mainline option by anticipating how many meals prisoners will eat, and it further reduces the cost of the mainline meal by using its farm produce program and reusing leftover food. In his deposition, the chief procurement officer for the Department testified that the cost of the program was sustainable.

In 2014–15, the total budget of the Department was $2.3 billion. The operating budget was $2.2 billion, including $54 million for food. The Department carried over a deficit of $15 million.

The parties agree that the Department has some budgetary tools that it can use to pay for at least part of the religious diet program without additional appropriations. The Department can freeze hiring and restrict nonessential travel by staff. The budget director also can transfer money from one program to another, but the amount that he can transfer is limited.

After we remanded the case in 2015, the parties filed cross motions for summary judgment. The district court granted summary judgment and entered a permanent injunction for the United States on the denial of kosher meals, the ten-percent rule, and the zero-tolerance rule. The injunction requires the Secretary "to offer a kosher diet . . . to all prisoners with a sincere religious basis for keeping kosher." It defines "kosher diet" as "food prepared consistent with the requirements recognized by a religious authority qualified to determine whether

7

food is kosher," and it requires all food to be "handled and prepared" in accordance with Procedure 503.006. The district court also granted summary judgment for the Secretary on the doctrinal sincerity testing and the anti-bartering policy. The Secretary appealed only the permanent injunction requiring the provision of kosher food.

## II. STANDARD OF REVIEW

We review a summary judgment *de novo*, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor. *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

The only issue on appeal is whether the Religious Land Use and Institutionalized Persons Act requires the Secretary to accommodate inmates with a sincere religious basis for keeping kosher. The Act provides that "[n]o government shall impose a substantial burden on the religious exercise" of an institutionalized person "unless the government demonstrates that imposition of the burden on that person" is both "in furtherance of a compelling governmental interest" and "the least restrictive means of furthering that compelling

8

governmental interest." 42 U.S.C. § 2000cc-1(a). The Secretary concedes that the United States met its burden of proving that the denial of kosher meals is "a substantial burden on the religious exercise" of a prisoner in the custody of the Secretary. *Id.* As a result, the Secretary had to prove that the denial of kosher meals is "the least restrictive means" of furthering a compelling governmental interest. *Id.*

The Secretary argues that Florida has a compelling interest in cost containment and that the complete denial of kosher meals is the least restrictive means of furthering that interest. We disagree on both counts. We address each argument in turn.

A. *The Secretary Has Not Proved a Compelling Governmental Interest.*

The Secretary failed to create a genuine dispute of material fact that the cost of providing kosher meals is so high that it is compelling. Congress has stated that the Act "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* § 2000cc-3(c). The Act "requires us to '"scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants"' and 'to look to the marginal interest in enforcing' the challenged government action in that particular context." *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015) (alteration in original) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014)). "[P]olicies grounded on

9

mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the [A]ct's requirements." *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 533 (11th Cir. 2013) (quoting *Lawson v. Singletary*, 85 F.3d 502, 509 (11th Cir. 1996)).

The evidence offered by the Secretary is insufficient to survive summary judgment. She argues that the projected total cost for the meals is high, that the Department has a budget deficit, that she might have to eliminate 246 positions to pay for the meals, and that staff vacancies are high. But the Secretary offers no "concrete evidence concerning how other operations of the prison system would be affected by these increased costs," *Garner v. Kennedy*, 713 F.3d 237, 246 (5th Cir. 2013), and we do not have enough information about the deficit or the vacancies to conclude that they might make the asserted interest compelling.

In *Knight v. Thompson*, 797 F.3d 934 (11th Cir. 2015), the Alabama Department of Corrections met its burden of proof to justify a prohibition on beards, and the sufficiency of the record in *Knight* makes apparent the insufficient record in this appeal. The Alabama Department presented testimony about "specific incidents in which male inmates had used long hair to conceal weapons and contraband, as well as a situation in which a male inmate had cut his long hair to significantly change his appearance after a successful escape." *Id.* at 944. The same witness testified that "prison staff have cut their hands on hidden razors when

10

searching male inmates' long hair." *Id.* Two witnesses testified that "long hair had concealed male inmates' fungus outbreaks, sores, cysts, and tumors, and even a spider's nest." *Id.* And witnesses offered "credible opinions, based on decades of combined correctional experience, that inmates can grab long hair during fights, long hair impedes the ability of prison staff to readily identify inmates inside the prison, and an exceptionless short-hair policy promotes order and discipline while removing a physical characteristic that inmates can use to form gangs." *Id.* at 944–45.

Unlike the Alabama Department, the Secretary fails to explain how the denial of kosher food furthers an interest in containing costs. She failed to compile anything like the record in *Knight*, and indeed the chief procurement officer for the Department testified to the contrary that the cost of the program was "sustainable . . . going forward."

The Secretary also fails to explain how she has a compelling governmental interest in not providing kosher meals to inmates now even though she voluntarily provided them in 2013. "[A] law cannot be regarded as protecting an interest 'of the highest order'"—a compelling governmental interest—"when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (quoting *Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring in part and

11

concurring in the judgment)). The creation of a program to serve kosher meals causes as much damage to the supposedly vital interest in not serving kosher meals as one could possibly appreciate. Our Circuit has "recognize[d] that the fact that Florida formulated a new kosher meal plan may be relevant to the question of whether a policy of not providing kosher meals is the least restrictive alternative to further a compelling interest." *Rich*, 716 F.3d at 531 n.5. And the Fifth Circuit has stated that the strength of a state's interest in denying kosher food "is dampened by the fact that it has been offering kosher meals to prisoners for more than two years and provides them at no cost to all observant Jewish inmates that accepted a transfer to [a certain prison]." *Moussazadeh*, 703 F.3d at 794–95. To be sure, changing circumstances can make an interest more compelling than it was before, but the Secretary has made no such showing.

The Secretary tries to avoid her evidentiary burden by shifting the blame to limited appropriations from the Florida Legislature, but the Act does not distinguish between parts of the government. *See* 42 U.S.C. § 2000cc-1(a). If the Secretary must provide kosher meals, then the legislature must appropriate enough funds to honor that obligation.

The Secretary also argues that costs will increase if the Department provides kosher meals because other inmates will seek their own accommodations, but this argument is a nonstarter. "At bottom, this argument is but another formulation of

12

the 'classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions.'" *Holt*, 135 S. Ct. at 866 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006)). The Supreme Court rejected this argument in *Holt*, and we do too.

Finally, the Secretary argues that the Federal Bureau of Prisons has denied kosher meals on the ground of cost, but it is mistaken. The Federal Bureau of Prisons instead has opposed efforts to *modify* the kosher diet because the kosher meal "[i]s the strictest diet and subsume[s] all other religious dietary needs." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 810 (8th Cir. 2008). Because the Secretary failed to do more than "simply utter the magic word[]" "costs," *Davila v. Gladden*, 777 F.3d 1198, 1206 (11th Cir. 2015), we must affirm the summary judgment against her.

### B. Even if the Secretary Had a Compelling Governmental Interest, She Has Not Proved That Denying Kosher Meals Is the Least Restrictive Means of Furthering That Interest.

The Secretary also has failed to create a genuine dispute of material fact about narrow tailoring. "'The least-restrictive-means standard is exceptionally demanding,' and it requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of

13

religion by the objecting part[y].'" *Holt*, 135 S. Ct. at 864 (alterations in original) (quoting *Hobby Lobby*, 134 S. Ct. at 2780).

The Secretary argues that denying a kosher diet statewide is the least restrictive means of furthering Florida's interest in cost containment, but she fails to rebut three arguments to the contrary. First, she fails to explain why the Department cannot offer kosher meals when the Federal Bureau of Prisons and other states do so. "[W]hen so many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course . . . ." *Id.* at 866. In *Rich*, we reversed the summary judgment for the Secretary in another action challenging the denial of kosher food in part because of "meager efforts to explain why Florida's prisons are so different from the penal institutions that now provide kosher meals such that the plans adopted by those other institutions would not work in Florida." 716 F.3d at 534. The Secretary does no better in this appeal. Second, the Secretary fails to explain why the Department cannot offer kosher meals when it offers vegan, medical, and therapeutic diets at similar marginal costs. "'[T]he proffered objective[] [is] not pursued with respect to analogous nonreligious conduct,' which suggests that 'th[e] interest[] could be achieved by narrower ordinances that burdened religion to a far lesser degree.'" *Holt*, 135 S. Ct. at 866 (quoting *Church of the Lukumi Babalu Aye*, 508 U.S. at 546). Third, the Secretary fails to explain why the less restrictive

14

alternative of enforcing rules that limit access to, and continued participation in, the program would not further her stated interest. The United States produced evidence that the Department is not screening out insincere applicants or enforcing the rules of participation in the program, and the Secretary does not contest that evidence. She instead responds that enforcing the rules would be too time-intensive. But she fails to cite any evidence or explain why it would be too time-intensive, so she has not created a genuine dispute of material fact.

## IV. CONCLUSION

We **AFFIRM** the summary judgment and injunction in favor of the United States.