[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13520

_____

D.C. Docket No. 5:12-cv-00026-WLS-CHW


LESTER J. SMITH,

Plaintiff - Appellee - Cross Appellant,


versus


BRIAN OWENS,
Commissioner of GDOC in his official
and individual capacities,

Defendant,


GREGORY DOZIER,
Commissioner of GDOC in his official
and individual capacities,

Defendant - Appellant - Cross Appellee.

_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(September 22, 2021)

Before MARTIN, NEWSOM, and BRANCH, Circuit Judges.

BRANCH, Circuit Judge:

Lester Smith sued the Georgia Department of Corrections (GDOC) under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, seeking relief from the GDOC's grooming policy. He claimed that the GDOC's grooming policy, which prohibits inmates from growing facial hair over a half-inch in length, placed a substantial burden on his religious exercise because as a Muslim he sought to grow an untrimmed beard. The district court rejected Smith's RLUIPA claim, finding that the "GDOC ha[d] offered logical and persuasive reasons to show that allowing untrimmed beards would be unmanageable for GDOC" and that "it is plausible that allowing a close security inmate like Smith an untrimmed beard could be dangerous for prison security." Rather than rule in favor of the GDOC in accordance with its own findings, however, the district court fashioned a remedy that neither party had requested: it held that RLUIPA entitled Smith to grow a three-inch beard. Both sides appealed from the district court's order, challenging its compromise remedy.

The district court's determination that it was reasonable for the GDOC to conclude that allowing Smith to grow an untrimmed beard would be both unmanageable and dangerous was not clearly erroneous. Accordingly, we affirm that finding by the district court. However, the district court's ruling requiring the

2

GDOC to allow Smith to grow a three-inch beard was improper.  Smith never asked the district court to allow him to grow a three-inch beard.  The district court's determination that the GDOC should nonetheless be required to allow three-inch beards was contrary to the Supreme Court's holding in *Holt v. Hobbs*, 574 U.S. 352 (2015), that courts should consider only the plaintiff's proposed alternatives in deciding whether there is an available less restrictive means for the government to further its compelling interests under RLUIPA.  Accordingly, we vacate the district court's order declaring that the GDOC's grooming policy violated RLUIPA and requiring the GDOC to alter its policy to allow three-inch beards.

## I.    Background

Lester Smith is serving a life sentence for murder and armed robbery, among other offenses, in one of the GDOC's close security prisons.  He is a Muslim and believes that he may not trim his beard under ordinary circumstances.  The GDOC is the fourth-largest prison system in the country, with approximately 53,000 inmates.  Before the Supreme Court's decision in *Holt*, the GDOC did not allow inmates to have beards of any length.  After *Holt*, the GDOC changed its grooming policy to allow half-inch beards.

In the GDOC's close security prisons—like the prison where Smith is held—81% of the inmates have been convicted of violent or sexual offenses.

Turnover of staff in these prisons is high and the GDOC "is unable to fill all of its security positions."  Moreover, since his incarceration, Smith, in particular, has been a discipline problem:

> Smith has been found guilty of 72 disciplinary offenses, which include[] three assaults on correctional officers, one assault on another offender, three possession of weapons offenses, two possession of drugs/narcotic offenses, two possession of a cell phone offenses, two bribery offenses, 32 failure to follow instructions or being insubordinate offenses, and numerous offenses related to threatening . . . correctional officers.

Smith has also been found guilty of violating the GDOC's grooming policy three times.  The record contains details about some of Smith's many disciplinary incidents.

- On June 6, 2010, Smith verbally threatened a correctional officer.  He told the officer that as "soon as he could get his hands on [the officer's] p*ssy *ss he was going to hurt [his] *ss," and then called the officer a "punk b*tch."

- That same day, Smith verbally threatened another correctional officer.  He told the officer, "I wish you would take the restraints off of me, I will beat all of your *sses."

- On January 8, 2012, Smith assaulted another inmate with a homemade weapon.

- On February 23, 2012, Smith assaulted a correctional officer.

- On June 30, 2013, Smith verbally threatened a correctional officer.  He jammed his tray box slider open and, when an officer attempted to close it, said "I'll f*ck you up and I will beat your *ss."

- On October 20, 2014, Smith was found to be in possession of a cell phone. "Cell phones are one of the most dangerous items of contraband," as testified to by the GDOC's Deputy Director of Field Operations Ahmed Holt.  According to Holt, they allow inmates to move other contraband, extort money from outside the prison, recruit gang members, put hits out on people, and plan escapes.

- On December 30, 2014, Smith was again found to be in possession of a cell phone, along with two weapons—"metal pieces sharpened to a point" that were hidden behind a sink.

## II.    Procedural History

On January 24, 2012, Smith sued the GDOC in the United States District Court for the Middle District of Georgia, alleging that forcing him to shave his beard infringed his right to practice an aspect of his faith in violation of RLUIPA. The GDOC moved for summary judgment and the district court granted its motion, finding that the GDOC demonstrated that its grooming policy was the least restrictive means of furthering its compelling interests in prison security, discipline, hygiene, and safety.  Smith appealed to this Court.

While Smith's appeal was pending, the Supreme Court decided *Holt*, which involved a RLUIPA challenge to an Arkansas policy that prohibited inmates from growing beards unless they had a particular dermatological condition.  574 U.S. at 355–56.  The prisoner in *Holt* sought permission to grow "only a ½-inch beard." *Id.* at 359.  The Supreme Court held that the Arkansas policy "violate[d] RLUIPA insofar as it prevent[ed] petitioner from growing a ½-inch beard in accordance with his religious beliefs."  *Id.* at 364, 369 (quotation omitted).

In light of *Holt*, we vacated the district court's summary judgment order in this case and remanded for further proceedings, emphasizing that "*Holt* calls for an individualized, context-specific inquiry that requires the GDOC to demonstrate

5

that the application of the grooming policy *to Smith* furthers its compelling interests. It requires the GDOC to consider the 'marginal interest in enforcing' the grooming policy *in Smith's case*." *Smith v. Owens*, 848 F.3d 975, 981 (11th Cir. 2017) (emphasis in original).

On remand, the case proceeded to a bench trial, at which the parties presented dueling witness testimony. At trial, the GDOC called Ahmed Holt, its Deputy Director of Field Operations, and Ronald Angelone, an expert witness who is the former director of the Virginia Department of Corrections (VDOC). Smith called John Clark—a former administrator with the Federal Bureau of Prisons (BOP), who worked at six federal prisons over a 44-year career in corrections—as his rebuttal expert.

Angelone and Holt testified about the problems the GDOC would face if it allowed untrimmed beards. Holt testified that inmates could hide weapons in beards and that the GDOC previously had found handcuff keys in an inmate's beard. Angelone testified that when he was at the VDOC, prison officials found a variety of contraband, including currency, handcuff keys, razor blades, and drugs, hidden in inmates' beards. Clark, by contrast, testified that the BOP, which permits untrimmed beards, had not experienced problems with contraband hidden in beards because it searches beards routinely and searches are a "great deterrent."

6

Although Angelone and Holt expressed concerns that a beard could be grabbed during inmate altercations and cause injury to an inmate, neither provided statistical evidence showing more incidents of violence in prisons that allow untrimmed beards, and Clark testified that there was no evidence that prison systems that permit untrimmed beards have heightened difficulties with violence or safety.

Finally, Angelone and Holt testified that beards can make it harder for prison staff to identify inmates and can facilitate escapes. Holt testified about an incident where a bearded GDOC inmate escaped, killed two officers, and then shaved his face, which made it difficult for officers to later identify him upon recapture. Angelone testified that when he was at the VDOC, an inmate with a "belt buckle" length beard escaped and then shaved his face, which completely altered his appearance. The inmate was found loitering several days later and was identified only after officers fingerprinted him. Clark responded that other prisons have instituted policies requiring that inmates' photos be taken annually and whenever an inmate's appearance changes and that those policies reduce the risk of officers being unable to identify inmates in an escape situation.

After a two-day bench trial, the district court ruled that the GDOC's grooming policy violated RLUIPA. After examining each of the GDOC's asserted compelling interests—"safety, security, and uniformity, minimizing the flow of

7

contraband, identification of inmates, hygiene, and cost"—the district court concluded that the GDOC's grooming policy was "underinclusive in many respects," noting that "[b]eards [did] not appear to present any more of a problem than longer head hair or clothes."[1]  Even so, the district court found that the GDOC "ha[d] offered logical and persuasive reasons to show that allowing untrimmed beards would be unmanageable for [it]."  The district court noted that the "GDOC has shown that its low staffing and high turnover rates play a significant part in its ability to monitor inmates and conduct searches" and that,

> [w]hile three inches of head hair is manageable, it is plausible that a beard of unlimited length could be much more difficult for GDOC to manage given, *e.g.*, its ability to be used to cause harm in the more violent male facilities, its ability to hide contraband more easily, the added difficulty in searching an untrimmed beard, and its ability to disguise a face.

Thus, the district court reasoned that, although the "GDOC . . . offered persuasive reasons why it cannot allow untrimmed beards at this time for which deference [was] due," "the same reasons [were] not nearly as persuasive when applied to a three inch-beard."  It found that "a three-inch beard cannot as easily be grabbed and used to cause harm."  It found that inmates hiding contraband in three-inch beards is not a "plausible concern," given that the GDOC allows male inmates to grow head hair up to three inches long.  It also found that the "GDOC ha[d] not

---

[1] GDOC's grooming policy allows male inmates to grow their head hair up to three inches long and allows female inmates to grow their head hair to any length.

shown that it could not effectively implement a three-inch beard policy and still successfully identify inmates after they shave" by taking regular photographs annually and when an inmate's appearance changes, as was "already require[d]" by the GDOC's policies.

As to Smith in particular, the district court found that "it is plausible that allowing a close security inmate like Smith an untrimmed beard could be dangerous for prison security," given Smith's "criminal history and disciplinary issues." But it found that the same reasoning was "unpersuasive in the context of allowing a three-inch beard because GDOC ha[d] presented little evidence to show that a three-inch beard is a significant security concern, and it already allows three-inch head hair."

Accordingly, the district court declared that the GDOC's grooming policy violated RLUIPA and ordered the GDOC to "modify its grooming policy to allow inmates qualifying for a religious exemption to grow a beard up to three inches in length . . . subject to revocation based on the inmate's behavior and compliance with the revised grooming policy." It also ordered the GDOC to provide Smith with such an exemption. Smith and the GDOC both appealed, challenging the three-inch compromise.

9

### III.    Standard of Review

We review the district court's legal conclusions *de novo* and its factual determinations for clear error.  *Knight v. Thompson*, 797 F.3d 934, 942 (11th Cir. 2015).  A factual determination is clearly erroneous only if we are left with "a definite and firm conviction that a mistake has been committed."  *Id.*

### IV.    Discussion

Smith's religious challenge to the GDOC's half-inch beard-length policy arises under RLUIPA, which provides that the government may not

> impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  The parties do not dispute that the GDOC's half-inch beard-length policy substantially burdens Smith's religious exercise because it does not allow Smith to grow an untrimmed beard.  Thus, the question here is whether the GDOC demonstrated that its half-inch grooming policy is the least restrictive means of furthering its compelling interests.[2]  *See Holt*, 574 U.S. at

---

[2] Smith does not dispute that the GDOC's stated interests related to his request to grow an untrimmed beard—"safety, security, and uniformity, minimizing the flow of contraband, identification of inmates, hygiene, and cost"—are compelling state interests.  We have characterized these interests as compelling.  *See Knight*, 797 F.3d at 944 (recognizing "compelling interests in security, discipline, hygiene and safety within . . . prisons"); *Lawson v. Singletary*, 85 F.3d 502, 512 (11th Cir. 1996) (per curiam) ("It is well established that states have a compelling interest in security and order within their prisons.").

362–64; *Smith*, 848 F.3d at 979–80; *Knight v. Thompson*, 796 F.3d 1289, 1292 (11th Cir. 2015) (per curiam) ("*Knight II*").

### A.     The District Court's Erroneous Three-Inch Beard Compromise

In the district court, Smith pursued only one remedy—the ability to grow an untrimmed beard.  As we summarized Smith's claim during his previous appeal: "[t]hroughout the course of this litigation, Smith [has] consistently expressed his belief that cutting his beard (without qualification as to length) contravenes the teachings of Islam." *Smith*, 848 F.3d at 978.

At trial after remand, however, the district court awarded a remedy that Smith never requested—the ability to grow a *trimmed* beard up to three inches in length.  Tellingly, Smith cross-appealed from the district court's judgment because it did not grant him the relief he had requested.  Smith calls the three-inch beard ruling "an arbitrary compromise without actual record support."

The district court erred in awarding a remedy Smith did not request.  In *Holt*, the Supreme Court applied RLUIPA's least-restrictive-means test by assessing only whether the state could refute the petitioner's proposed alternative policy—a half-inch beard—not the universe of all possible alternatives.  In particular, the Court noted that, once the petitioner showed that the prison's grooming policy substantially burdened his exercise of religion, "the burden shifted to the Department to show that its refusal *to allow petitioner to grow a ½-inch beard*"

11

furthered a compelling governmental interest and was the least restrictive means of doing so. 574 U.S. at 362 (emphasis added). Thus, to satisfy the least-restrictive-means test of RLUIPA, the GDOC was only required "to prove that *petitioner's proposed alternatives* would not sufficiently serve its security interests." *Id.* at 367 (emphasis added); *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) (explaining that, to meet its burden, the government "must refute the alternative schemes offered by the challenger"). It was not "required to refute every conceivable option." *Wilgus*, 638 F.3d at 1289 (quotation omitted).[3] Rather, it

---

[3] *Wilgus* involved the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, which applies the same standard as RLUIPA. *See Holt*, 574 U.S. at 358. In both RLUIPA and RFRA cases, other circuits have agreed that the government need not refute "every conceivable option" to satisfy the least-restrictive-means test. *See Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 41 n.11 (1st Cir. 2007) ("[W]e do not construe RLUIPA to require prison administrators to refute every conceivable option in order to satisfy the least restrictive means prong." (quotation omitted)); *May v. Baldwin*, 109 F.3d 557, 563 (9th Cir. 1997) (explaining that prison officials are not required to refute every conceivable alternative); *Hamilton v. Schriro*, 74 F.3d 1545, 1556 (8th Cir. 1996) ("It would be a herculean burden to require prison administrators to refute every conceivable option in order to satisfy the least restrictive means [test].").

As the Tenth Circuit explained in *Wilgus*:

The task of deciding whether a particular regulatory framework is the least restrictive—out of all conceivable—means of achieving a goal virtually begs a judge to go on a fishing expedition in his or her own mind without tethering the inquiry to the evidence in the record. It is incumbent upon us, therefore, to limit ourselves to consideration of the alternative regulation schemes proffered by the parties, and supported in the record. A statute that asks whether a regulation is the least restrictive means of achieving an end is not an open-ended invitation to the judicial imagination.

638 F.3d at 1289.

was required to refute only the one alternative Smith proposed—that he be allowed to grow an untrimmed beard.[4]

The dissent contends that requiring the GDOC to allow Smith to grow a three-inch beard was an "available alternative remedy" of which both Smith and the GDOC were aware during the district court proceedings and that the GDOC was "on notice that a three-inch remedy was a possible outcome here." But the parties were under no obligation to address a possible alternative remedy simply because there were some stray references to it in the record. *Holt* did not establish a "notice" standard. Rather, only the "petitioner's proposed alternatives" were at issue. *Holt*, 574 U.S. at 367.

Smith never proposed a three-inch beard as an alternative.[5] In his complaint, Smith alleged the GDOC was violating his rights under RLUIPA because he was "being forced to shave his beard." At trial, neither Smith nor his counsel indicated that a three-inch beard would accommodate Smith's religious beliefs. During closing argument, Smith's counsel reiterated the position that he advanced at all

---

[4] That the government must refute only the potential alternatives offered by the plaintiff is not a rule that appears on the face of RLUIPA itself. *See* 42 U.S.C. § 2000cc-1 (providing without further elaboration that the government must "demonstrate[] that imposition of [a substantial] burden [on the religious exercise of a person] . . . is the least restrictive means of furthering [a] compelling governmental interest"). However, the rule follows from *Holt*, and we follow the Supreme Court's interpretations of federal statutes like RLUIPA. *See EEOC v. Atl. Gas Light Co.*, 751 F.2d 1188, 1191 (11th Cir. 1985) ("The Supreme Court's role as final arbiter encompasses . . . the power to define the meaning of a statute.").

[5] In *Holt*, by contrast, the petitioner specifically "proposed a 'compromise' under which he would grow only a ½-inch beard." 574 U.S. at 359.

13

stages of the district court proceedings: "Plaintiff's Muslim faith, which requires him to grow an untrimmed beard, is burdened by Defendant's half-inch beard policy." And on appeal, Smith asserts that his "sincere religious beliefs require him to grow an untrimmed beard" and that "[t]he district court did err . . . in limiting the relief it ordered to three inches." Thus, it is clear that Smith did not propose a three-inch option.[6]

The district court erred in evaluating the three-inch beard option, which was not an option proposed by Smith. Instead, under *Holt*, the district court was required to determine only if the GDOC had met its burden in proving that the *untrimmed* beard option would not sufficiently serve its security interests. The district court, in fact, performed this analysis and found that the GDOC met this burden as to an untrimmed beard—a finding that, as discussed below, we affirm.

---

[6] As the dissent notes, the GDOC asked questions of Smith (at his deposition) and its own fact witness Holt (at trial) about shorter beard lengths. The dissent "can think of no reason why GDOC would refute the feasibility of a three-inch beard as an alternative unless it knew that alternative was a potential remedy." It is not always clear what a plaintiff's final request for relief will be before, or even during, trial. It may be that, by asking questions about other beard lengths before and during trial, the GDOC was laying a record to oppose such an alternative if the need arose—which it never did, because Smith never requested any remedy other than an untrimmed beard at any point.

Moreover, requiring the government to rebut alternatives that were barely hinted at in the district court would run afoul of basic rules of fair notice in our adversarial system. In this case, the GDOC made only a token effort to address the three-inch alternative—likely because Smith never put the three-inch option at issue. If Smith had asked the district court to allow him to grow a shorter beard, the parties presumably would have put more effort into developing a detailed record regarding shorter beards. Instead, the district court granted the three-inch remedy with little to go on.

Accordingly, we vacate the district court's order declaring that the GDOC's half-inch beard policy violated RLUIPA, requiring the GDOC to modify its grooming policy to allow three-inch beards for inmates qualifying for religious exemptions, and requiring the GDOC to allow Smith to grow a three-inch beard.[7]

## B. The District Court's Decision that Smith Is Not Entitled to Grow an Untrimmed Beard Was Not Clearly Erroneous

As noted above, within its order embracing a three-inch compromise, the district court correctly refused to allow Smith to grow an untrimmed beard. Smith proposed only one alternative to the GDOC's half-inch beard policy—he wanted an untrimmed beard. And the GDOC presented evidence that untrimmed beards would be unworkable and dangerous in its prisons, both generally and as applied to Smith. Hearing this evidence at trial, the district court found that the GDOC "offered logical and persuasive reasons to show that allowing untrimmed beards would be unmanageable for [it]" as a general matter:

> While three inches of head hair is manageable, it is plausible that a beard of unlimited length could be much more difficult for GDOC to manage given, *e.g.*, its ability to be used to cause harm in the more violent male facilities, its ability to hide contraband more easily, the added difficulty in searching an untrimmed beard, and its ability to disguise a face. . . . As such, the Court finds that GDOC has offered

---

[7] Because we conclude that the GDOC's grooming policy does not violate RLUIPA, we need not reach the issue of whether the district court's statewide injunction requiring the GDOC to modify its grooming policy and allow any inmate with a religious exemption to grow a three-inch beard violated the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e *et seq.*

persuasive reasons why it cannot allow untrimmed beards at this time
for which deference is due.

The district court also analyzed the GDOC's policy barring untrimmed beards as applied specifically to Smith, a convicted murderer and maximum-security inmate who has had dozens of disciplinary infractions while incarcerated. Given Smith's criminal history and disciplinary record, the district court found that "it is plausible that allowing a close security inmate like Smith an untrimmed beard could be dangerous for prison security." Neither of these findings is clearly erroneous.

"For both [the compelling interest and the least-restrictive-means] prongs of its strict scrutiny test, RLUIPA mandates an individualized inquiry." *Tucker v. Collier*, 906 F.3d 295, 301 (5th Cir. 2018); *see Smith*, 848 F.3d at 981 ("*Holt* calls for an individualized, context-specific inquiry."); *Fegans v. Norris*, 537 F.3d 897, 907 (8th Cir. 2008) (same). The government must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 363 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014)). Consistent with that principle—and with *Holt*—when this case was last before us, we remanded it to the district court for "an individualized, context-specific inquiry that requires the GDOC to demonstrate that application of [its] grooming policy *to Smith* furthers its compelling interests." *Smith*, 848 F.3d at 981 (emphasis in original).

16

The district court did not clearly err in finding, based on the GDOC's evidence at trial, that allowing any inmate, including Smith, to grow an untrimmed beard presents safety and security risks. The GDOC's witnesses, Angelone and Holt, testified that untrimmed beards raise concerns about inmates hiding contraband and altering their appearance to avoid identification, as well as injuring each other by grabbing beards during altercations.

The GDOC's concerns are not theoretical. Holt testified that the GDOC previously discovered an inmate with a homemade handcuff key in his beard, which "creates a major risk primarily for escape" and "the assault of an officer" given that handcuff keys allow an inmate to get out of his restraints. The GDOC has discovered other dangerous items in its prisons that can be hidden in untrimmed beards, such as shanks and cell phones. Similarly, Angelone testified about dangerous items and contraband that have been discovered in VDOC inmates' beards. Holt and Angelone also testified about past incidents where inmates with beards escaped and then shaved their faces, which hindered officers' ability to identify and capture them.

At trial, the GDOC also distinguished its half-inch-beard policy from its policies allowing male prisoners to grow three inches of head hair and allowing female prisoners and staff to wear head hair of any length. As the district court found, the GDOC "show[ed] that its female inmates are less violent" than its male

17

inmates.  The GDOC also established through witness testimony that, "[w]hile three inches of head hair is manageable," an untrimmed beard plausibly could be used to cause injury, hide contraband, and disguise an inmate.

The GDOC likewise demonstrated at trial why permitting Smith in particular to grow an untrimmed beard would harm its interests in safety and security.  Smith is serving a life sentence in a close security prison for murder and armed robbery, among other offenses.  He has an extensive disciplinary record and has been found guilty of assaulting correctional officers and other inmates; threatening correctional officers; possessing weapons, cell phones, and contraband; and disobeying the GDOC's grooming policy.

We must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005); *see id.* at 722 (stating that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety"); *see also Knight*, 797 F.3d at 943–44 (discussing *Cutter*).  Although the GDOC is not entitled to unquestioning deference, the evidence that it provided at trial is similar to the "expert opinions, lay testimony, and anecdotal evidence based on . . . decades of

18

combined experience as corrections officers" that we accepted in previous cases, such as *Knight*.[8]  797 F.3d at 939–40, 944–47.

Given Smith's criminal and disciplinary history, the testimony from Holt and Angelone, and the GDOC's evidence of contraband being hidden in beards and prior incidents where escaped inmates with beards shaved their faces to avoid detection, the district court's conclusion—that "it is plausible that allowing a close security inmate like Smith an untrimmed beard could be dangerous for prison security"—is not clearly erroneous.

The dissent would hold otherwise.  As a threshold matter, the dissent "do[es] not read" the district court to have found that allowing untrimmed beards would be unmanageable and dangerous for the GDOC.  But without that finding, the district court could not have ruled the way it did.  At trial, it was the GDOC's burden to establish that it could not further its compelling interests in prison security, discipline, hygiene, and safety in a less restrictive way by allowing untrimmed beards.  If the district court had found that the GDOC had not met that burden, it would have granted Smith's requested relief.

To the contrary, the district court found that the GDOC "offered logical and persuasive reasons to show that allowing untrimmed beards would be

---

[8] In *Knight*, we affirmed the district court's ruling that Alabama's "exceptionless short-hair policy" for male inmates was the least restrictive means of furthering compelling interests in security, discipline, hygiene, and safety.  *See* 797 F.3d at 945–47.

unmanageable." It found that the "GDOC has shown that its female inmates are less violent" and that untrimmed beards could "be used to cause harm in the more violent male facilities." It found that there is "added difficulty in searching an untrimmed beard" and that conducting searches of untrimmed beards would be "unmanageable for GDOC" given the GDOC's low staffing and high turnover rates. And it found that inmates can "hide contraband more easily" and "disguise a face" using untrimmed beards. Thus, the district court found it "plausible that a beard of unlimited length could be much more difficult for GDOC to manage." Similarly, as to Smith in particular, the district court found that Smith was a maximum security inmate with a long disciplinary record, and thus that it was "plausible that allowing a close security inmate like Smith an untrimmed beard could be dangerous for prison security." All of these were findings of fact that led to the district court's ultimate conclusion that RLUIPA did not entitle Smith to his requested remedy—an untrimmed beard.

The dissent says the district court's statements about how it is "plausible" that untrimmed beards could be unmanageable and dangerous were not part of the district court's findings because "descriptions of what might or might not be plausible do not constitute findings of fact." But courts often find "facts" of a less-than-certain nature. Indeed, the district court's finding based on testimony from Smith's expert witness about how allowing prisoners to practice their religious

beliefs "made [other prison] environment[s] safer"—testimony that, as the dissent notes, the district court "credited"—was similarly indeterminate: "[t]hus, *it could very well be* that GDOC's interests in prison safety and security would be furthered if it allows longer beards."

The dissent would require the GDOC to show that "untrimmed beards are actually—not just plausibly—unmanageable." The district court *did* find that the GDOC made that showing, when it said "the Court finds that GDOC has offered persuasive reasons why it cannot allow untrimmed beards at this time for which deference is due." In any case, it would be *actually* unmanageable to institute a grooming policy that may *plausibly* result in harm to inmates, staff, or the public. The law does not require prison systems to show with absolute certainty that an alternative policy will have adverse effects. It is enough to show the risk of those effects. *See Knight*, 797 F.3d at 947 (holding that Alabama met its burden under RLUIPA where it showed that the plaintiffs' requested religious exemption "pose[d] actual, security, discipline, hygiene, and safety *risks*") (emphasis added). If this were not the case, the "due deference" courts owe prison systems in protecting against dangers to safety and security would have no role to play. *Cutter*, 544 U.S. at 723.[9]

---

[9] The dissent notes that "[p]lausibility is what is necessary to survive a motion to dismiss," not "a judgment after trial." At the motion-to-dismiss stage, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), requires a plausible claim to relief, *taking as true* the facts pled

The dissent characterizes the Court as "tak[ing] on the role of fact finder" and "reweigh[ing] evidence" by disregarding the district court's relevant findings and relying instead on testimony the district court discredited.  But our analysis simply tracks how the district court treated the conflicting testimony offered by the parties at trial.  As the dissent notes, the district court found the testimony of the GDOC's witnesses speculative and uncompelling in several respects.  The district court found that the GDOC entirely failed to establish safety, security, or manageability concerns regarding *three-inch* beards, and that the testimony of Smith's expert witness persuasively indicated there were no such concerns.  But the district court *also* found the testimony of the GDOC's witnesses credible and persuasive in establishing safety, security, and manageability concerns regarding *untrimmed* beards.  Only the latter set of findings is relevant for our review.[10]  It is true that the district court found the same testimony persuasive in one part of its

_____

in the complaint.  550 U.S. at 556–57, 570.  The district court took no facts as true at trial.  It heard and saw evidence and, after having done so, issued findings of fact, including findings about what is "plausible" based on the evidence presented.

[10] Thus, the dissent focuses on the wrong part of the record.  It cites the district court's findings that, *e.g.*, prisoners can hide contraband in places other than beards, officers can effectively search beards without putting themselves in danger, and concerns about prisoners with beards being injured were "speculative."  Each of these findings related to the district court's three-inch compromise policy, not its determination that Smith is not entitled to grow an untrimmed beard.

Contrary to the dissent's assertion, there is no need for the Court to address the district court's findings about three-inch beards, or to opine on whether those findings were clearly erroneous.  The three-inch remedy was never proposed by Smith and the district court erred in considering it, whether or not its factual findings relating to that remedy were accurate.

22

analysis and unpersuasive in another part.  But evidence is often persuasive for one reason and not for another.  It was not clearly erroneous for the district court to find that the GDOC did not meet its burden to establish safety, security, and manageability concerns with respect to shorter beards, but did with respect to untrimmed beards.

The dissent asserts that, "on this record, the only permissible conclusion is that RLUIPA entitles Mr. Smith to grow an untrimmed beard," and that, if the district court did make a finding that the GDOC "offered persuasive reasons why it cannot allow untrimmed beards," that finding was clearly erroneous.  The dissent says the district court's "findings here in Mr. Smith's case were resolved almost entirely against GDOC."  But the district court resolved factual issues about whether the GDOC has low staffing and high turnover rates, and whether an untrimmed beard could potentially be used to "cause harm in the more violent male facilities," to "hide contraband more easily," and to "disguise a face," in *favor* of the GDOC.  The testimony of the GDOC's witnesses supported those findings. That other evidentiary findings by the district court were a weight in the opposite direction does not make the district court's findings about the risks presented by untrimmed beards clearly erroneous.  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."

23

*Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1227 (11th Cir. 2000) (quoting

*Anderson v. City of Bessemer*, 470 U.S. 564, 573–74 (1985)).

The dissent also focuses on the differences between the GDOC's grooming

policy and the grooming policies of other prisons, asserting that the "GDOC has

not shown how it is different from prison systems that now successfully

accommodate untrimmed beards." As the dissent notes, the district court found

that 37 states, the District of Columbia, and the BOP "allow inmates, either by

their standard policy or through an exemption, to grow a beard without any length

restrictions."

It is true that, in *Holt*, the Supreme Court stated that "the policies followed at

other well-run institutions would be relevant to a determination of the need for a

particular type of restriction." 574 U.S. at 368. But the Court also wrote:

> We do not suggest that RLUIPA requires a prison to grant a particular
> religious exemption as soon as a few other jurisdictions do so. But
> when so many prisons offer an accommodation, a prison must, at a
> minimum, offer persuasive reasons why it believes that it must take a
> different course . . . .

*Id.* at 369. Because the defendants in *Holt* offered only their "mere say-so" that

they could not accommodate the plaintiff's request to grow a half-inch beard, the

Supreme Court held that they failed to show why they were unable to

accommodate that request when "the vast majority of States and the Federal

Government permit inmates to grow ½-inch beards." *Id.* at 368.

24

Contrary to the dissent's view, *Holt* does not require the GDOC to detail other jurisdictions' successes and failures with their grooming policies to satisfy a RLUIPA inquiry. "While the practices of other institutions are relevant to the RLUIPA analysis, they are not controlling—the RLUIPA does not pit institutions against one another in a race to the top of the risk-tolerance or cost-absorption ladder." *Knight*, 797 F.3d at 947. The GDOC's obligation was to show that "its departure from the practices of other jurisdictions stems not from a stubborn refusal to accept a workable alternative, but rather from a calculated decision not to absorb the added risks that its fellow institutions have chosen to tolerate." *Id.*

The GDOC met this burden. At trial, it supported its decision to prohibit Smith from growing an untrimmed beard with documentary evidence and witness testimony that the district court credited. The GDOC offered two persuasive reasons for its decision to continue to prohibit untrimmed beards although other jurisdictions allow them. *First*, the GDOC demonstrated that it has had specific issues with inmates hiding contraband in beards and altering their appearance to avoid identification.[11] *Second*, the district court found that the GDOC "show[ed] that its low staffing and high turnover rates play a significant part in its ability to monitor inmates and conduct searches" and therefore that "allowing untrimmed

---

[11] In *Holt*, by contrast, the defendants' witnesses "expressed the belief that inmates could hide contraband in even a ½-inch beard, but neither pointed to any instances in which this had been done in Arkansas or elsewhere." 574 U.S. at 359.

25

beards would be unmanageable for GDOC." This case is not one of "officials' mere say-so" like in *Holt*. 574 U.S. at 369.

Nor is it clear that Smith would even be allowed to grow an untrimmed beard in several of the other jurisdictions that generally permit inmates to grow beards without length restrictions. The record indicates that the grooming policies in many of those jurisdictions allow an inmate to grow an untrimmed beard *unless* the inmate's appearance violates the prison's requirements for safety, security, identification, and hygiene.[12] As a convicted murderer with an extensive disciplinary record, including infractions involving assault and hiding weapons and contraband, it is no stretch to think that Smith might likely qualify for the "safety" and "security" exceptions in many or all of the jurisdictions that have them.

The dissent says the GDOC "offered arguments . . . but not evidence" to support its assertion that "its prisons are different" than others. The dissent faults the GDOC for not providing data about, *e.g.*, "the percentage of violent inmates in other prison systems." However, the GDOC *did* offer evidence supporting the

_____

[12] A similar scenario was presented in *Knight*, which involved inmates' challenges to an Alabama policy prohibiting them from wearing uncut hair. *See* 797 F.3d at 937. In arguing that the policy was not the least restrictive means available to the government, the plaintiffs asserted that several other prison systems give inmates the freedom to choose their hair length. *See id.* at 946–47; *Knight II*, 796 F.3d at 1293. We noted that "it is not apparent that the Plaintiffs presented evidence that all of these 39 other prison systems would allow their *specific* requested accommodation—long, unshorn hair," because "the policies ma[d]e clear that the chosen hair length cannot pose risks for health, safety, hygiene, order, or security." *Knight II*, 796 F.3d at 1293.

26

particular reasons for its decision to continue with its half-inch beard-length policy—fact and expert witness testimony, the same type of evidence this Court found sufficient to meet the government's burden in *Knight*. *See* 797 F.3d at 939 (holding that Alabama met its evidentiary burden under RLUIPA with "elucidating expert opinions, lay testimony and anecdotal evidence based on . . . decades of combined experience as corrections officers," even though the "witnesses offered little statistical evidence to support their claims"). That the GDOC did not offer a particular type of evidence does not mean that it failed to provide proof at all.

The dissent fears that, by affirming the district court's finding that the GDOC met its burden under RLUIPA, we render *Holt* "meaningless." In *Holt*, the Court said that "prison officials' mere say-so" is not enough to distinguish a prison system's practices from those of other, more permissive jurisdictions. Thus, "mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements." *Knight*, 797 F.3d at 944 (quotation omitted). However, a reasonable evidentiary showing by the government at trial should be met with the "due deference" courts owe to prison administrators' expertise. *Cutter*, 544 U.S. at 723. This approach strikes the medium the Supreme Court counseled in *Cutter*: that RLUIPA should "be applied in an appropriately balanced way, with particular sensitivity to security concerns." *Id.* at 722.

27

We affirm the district court's finding that allowing Smith to grow an untrimmed beard presented safety and security risks and would be unmanageable for the GDOC.  That finding was reasoned and supported by the GDOC's evidentiary showing at trial and was not clearly erroneous.

## V.    Conclusion

For the reasons explained above, the judgment of the district court is **AFFIRMED** in part and **VACATED** in part.

MARTIN, Circuit Judge, dissenting:

As the majority has described, Lester James Smith is a devout Muslim who is now incarcerated in a Georgia state prison. Mr. Smith sincerely believes the tenets of Islam, including that he may not cut his beard. Georgia's grooming policy prohibits prisoners from growing beards longer than a half-inch, so the Georgia Department of Corrections ("GDOC") forbids Mr. Smith from growing the full-length beard his sincerely held religious beliefs require. Disobeying GDOC's policy leads to disciplinary action and Mr. Smith has been held down and forcibly shaved on more than one occasion.

Citing its beard policy, GDOC denied Mr. Smith's request for a religious accommodation to grow an untrimmed beard. GDOC's refusal led Mr. Smith to file this lawsuit in January 2012. Initially proceeding pro se, he challenged GDOC's grooming policy under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 114 Stat. 803, 42 U.S.C. § 2000cc et seq., alleging that the policy substantially burdened the exercise of his sincerely held religious beliefs because he understands his Muslim faith to prohibit shaving or cutting his beard. Mr. Smith sought nominal damages and an injunction requiring GDOC to allow him to grow his beard without restrictions. Mr. Smith's case was finally tried before the District Court in 2018. Following the trial, in August 2019,

29

the District Court issued its Order containing thorough findings of fact and conclusions of law.

The District Court ruled that GDOC's current policy permitting only half-inch beards violates RLUIPA. The court also said that GDOC offered "logical and persuasive reasons to show that allowing untrimmed beards would be unmanageable." But the District Court found these reasons are "not nearly as persuasive when applied to a three-inch beard." In this way, the court arrived at a middle ground, which would allow prisoners with religious exemptions to grow three-inch beards as a "reasonable less restrictive alternative." Relying on the facts it found after conducting the trial, the District Court entered a permanent injunction ordering GDOC to "modify its grooming policy to allow inmates qualifying for a religious exemption to grow a beard up to three inches in length." It also ordered GDOC to grant Mr. Smith such a religious exemption.

The majority opinion recites that it affirms the District Court Order in part and vacates in part. Maj. Op. at 2–3. But make no mistake, the effect of the majority opinion is to restrict Mr. Smith to growing his beard no longer than one-half inch in length. This is an all-out victory for the GDOC, on a record that does not support this result. In support of its ruling, the majority opinion says the District Court made a finding that if Mr. Smith were allowed to grow an untrimmed beard, this would be unmanageable for GDOC and then affirms the

30

purported finding of the District Court on this point. Id. at 2. However, I do not read the District Court Order to have made any such finding. For this and other reasons, I would allow Mr. Smith to grow an untrimmed beard, which is the relief he has sought for over a decade. During the trial of this case, GDOC was given a full opportunity to prove that it cannot accommodate untrimmed beards. It utterly failed to do so. On this record, the law requires GDOC to permit Mr. Smith to grow his beard uncut.

In the alternative (and given that the majority's ruling will serve as an ongoing impediment to Mr. Smith's ability to grow the full-length beard his religion requires), I would affirm the District Court's injunction to the extent it orders GDOC to allow Smith to grow a three-inch beard. Contrary to the assertions of the majority opinion, the parties were aware that the relief of a three-inch beard was being considered, presented testimony about it, and the District Court was well within its authority to grant it.

I will first discuss the record before us on appeal. I will then explain why, on that record, Mr. Smith must be allowed to grow an untrimmed beard. To end, I will turn to the District Court's Order granting prospective relief.

**I.**

The District Court made findings after a two-day bench trial in which GDOC had the opportunity to prove it could not allow any religious exemption to

31

its half-inch beard policy because of concerns over contraband, safety and violence, identification of prisoners, and hygiene. To that end, GDOC called two witnesses: Ahmed Holt, GDOC's Deputy Director of Field Operations, and Ronald Angelone, its expert. Mr. Angelone is a former director in the Virginia Department of Corrections who also worked in prisons in Illinois, Oklahoma, Texas, and Nevada. Mr. Smith's witness, who served as his rebuttal expert, was John Clark. Mr. Clark is a former administrator with the Federal Bureau of Prisons ("BOP"), who worked at six federal prisons over a 44-year career in corrections. I now set forth the evidence presented and findings made with respect to each of the compelling interests GDOC asserts as requiring Mr. Smith to cut his beard. My review of this record reveals a total failure of proof by GDOC.

Contraband. As the majority notes, Mr. Angelone testified that during his time in Virginia, officers found several items of contraband in prisoners' beards, including handcuff keys, razor blades, and drugs. Maj. Op. at 6. GDOC has also found a handcuff key hidden in a beard. However, Mr. Holt testified that prisoners hide contraband "[e]verywhere"—"on their person, in their clothing, in their hair, under their arms, in their orifices." And, according to Mr. Angelone, contraband in beards "does not present different risks or dangers than contraband in clothes." Mr. Clark testified that searches are "a great deterrent" and that with procedures for routinely searching beards "inmates are going to put their contraband

32

somewhere else." Mr. Clark recounted that the BOP and many state prisons use a "self-search" method whereby the prisoner "vigorously frisk[s]" his beard and, if it is long, twists it from side to side and lifts it up for inspection. On this record, the District Court affirmatively made the finding that GDOC "ha[d] not shown that its concerns about contraband in beards cannot be addressed by simply searching beards."

Safety and violence. Although Mr. Holt testified that a beard can be grabbed with resulting injury to a prisoner, the District Court found this hazard to be merely "speculative" because GDOC does not allow beards longer than a half-inch and Holt "provide[d] no basis for this opinion."[1] And the court credited Mr. Clark's testimony that "in the real world" there is "no evidence that that's a risk," and, in fact, BOP found that allowing prisoners to practice their religion "helped prisoners develop themselves" and "made the environment safer."

Notwithstanding GDOC's argument to the contrary, the District Court found no indication that "guards would have to physically search inmates' beards face-to-face and expose themselves to being struck." Mr. Smith's evidence "persuasively indicate[d] that officers do not have to put themselves in danger to effectively

---

[1] The majority relies on this testimony from Mr. Holt despite the District Court discrediting it. Maj. Op. at 17. As set out in more detail below, the majority relies on several discredited portions of the record without ever mentioning the District Court's contrary findings related to that evidence. It is not the proper role of the court of appeals to weigh conflicting testimony, yet the majority opinion offers no explanation for its reliance upon testimony rejected by the District Court.

33

search a beard." And GDOC offered "no logical explanation as to why it could not use the [self-search] method currently employed by BOP and other states for searching a beard."

Prisoner identification. Mr. Angelone hypothesized that taking photos when a prisoner's appearance changes would be expensive and there would be no place to store them. Yet the District Court found GDOC's policy already requires that prisoners' photos be taken annually and whenever their appearance changes, and that those photos are stored digitally. The court therefore found that "GDOC's concerns about identifying inmates could be addressed by enforcing the policy that GDOC already has and making improvements." The court also credited Mr. Clark's testimony that similar policies have been "successfully implemented around the country."

Hygiene. Despite GDOC's arguments that beards can create hygiene concerns and hide medical problems, the District Court found that head hair presents the same concerns and that GDOC's procedures for head hair (requiring inspection during haircuts) could be implemented for beards.

*  *  *

On my review, the testimony and evidence I've outlined fail to support GDOC's argument that it cannot accommodate untrimmed beards. Of course my colleagues disagree with how the District Judge and I evaluate the evidence. But I

34

hope our debate about the details of the record does not detract from the gravity of the majority ruling. It means that Mr. Smith—a man sentenced to live and die in Georgia's prisons—is prohibited from growing the untrimmed beard his religion requires. Reviewing the entirety of the findings of fact thoroughly made by the District Judge, this should not be the result.

## II.

Indeed, on this record, the only permissible conclusion is that RLUIPA entitles Mr. Smith to grow an untrimmed beard. Because GDOC's actions interfere with Mr. Smith's religious practices, it has a high bar to clear. RLUIPA gives "expansive protection" for prisoners' religious liberty. Holt, 574 U.S. at 358, 135 S. Ct. at 860. Under RLUIPA, a prison is not allowed to "impose a substantial burden" on a prisoner's "religious exercise" unless doing so satisfies strict scrutiny: The challenged policy must be "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc-1(a). No one here disputes that Mr. Smith's religion forbids him from cutting his beard, so any policy that forces him to do so substantially burdens his religious exercise. To satisfy RLUIPA, then, GDOC is required to "prove" that forbidding Mr. Smith from growing an untrimmed beard is the least restrictive means of furthering its compelling interest. Holt, 574 U.S. at 364, 135 S. Ct. at 864. This standard is "exceptionally demanding." Id. (quotation marks omitted). If any "less restrictive

35

means is available for the Government to achieve its goals, the Government must use it." Id. at 365, 135 S. Ct. at 864 (quotation marks omitted). Said another way, unless GDOC proves it cannot accommodate untrimmed beards, it must allow them. GDOC utterly failed to make this required showing.

### A.

To begin, GDOC has not shown how it is different from prison systems that now successfully accommodate untrimmed beards. In Holt, the Supreme Court made clear that "when so many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course." Id. at 369, 135 S. Ct. at 866. Here, the District Court found that 37 states, the District of Columbia, and the BOP allow prisoners to grow beards "without any length restriction."[2]

Although GDOC argued at trial that "its prisons are different because they house a large number of more violent inmates and they don't have the same staff

---

[2] The majority downplays the District Court's finding about the overwhelming number of other prison systems that allow untrimmed beards by speculating that Mr. Smith would not be allowed to grow his beard uncut in those prisons. See Maj. Op. at 26–27. The record does not bear this out. True, Mr. Clark testified that some other prison systems disallow untrimmed beards on an individual basis where there is a "documented" and "compelling" reason that a prisoner's uncut beard itself threatens safety, security, or sanitation. But when asked whether Mr. Smith's disciplinary record would prevent him from growing an untrimmed beard in other facilities, Mr. Clark responded: "I don't agree with that at all. I don't see there's any correlation there. I had inmates who had killed staff who wore beards . . . . [T]he beard restriction would only come up if the beard had been used in contravention of the grooming policy[.]" Mr. Clark explained that even for prisoners "who've made mistakes and sometimes continue to make mistakes in prison," this "doesn't rise to the level of reducing their religious privileges." As for

36

ratios and resources to accommodate beards," it offered no meaningful evidence to support that factual assertion. In other words, GDOC offered arguments—"mere say-so"—but not evidence. See Holt, 574 U.S. at 369, 135 S. Ct. at 866. Based on GDOC's offering, the District Court found, consistent with the record, that the "only specific differences" GDOC identified were that "California has cat walks and AR-15s and New York has better staffing ratios." But the court noted that GDOC provided "no information on the percentage of violent inmates in other prison systems, gang membership in other prison systems, or inmates serving a life sentence in other prison systems," information that is easily attainable. Indeed, the court found GDOC "ha[d] not even attempted to determine how other states manage inmates with beards." This may well be because other prison systems manage untrimmed beards just fine. As the United States Department of Justice explained during oral argument: "BOP does allow untrimmed beards, [and] it has for more than four decades. . . . BOP has managed the nation's largest correctional system under the same heightened scrutiny standard as RLUIPA and does so while maintaining prison security, public safety, and the constitutional rights of other prisoners." Oral Arg. at 25:39–26:18.

---

hygiene, Mr. Smith's religion requires him to maintain neatness and cleanliness, including in his facial hair. And the District Court noted there is "no evidence" that Mr. Smith has any hygiene problems at GDOC.

The legal standards governing religious practices do not allow GDOC to meet its heavy evidentiary burden by merely offering unsubstantiated arguments. Holt is clear that "prison officials' mere say-so" that they cannot accommodate untrimmed beards is not sufficient. 574 U.S. at 369, 135 S. Ct. at 866. As I understand the majority's analysis, it requires courts to accept any assertion a prison official makes, even where there is a lack of easily attainable factual support for that assertion. That approach is inconsistent with Holt.

The majority supports its conclusion GDOC met its burden here by suggesting that our Court's precedent in Knight v. Thompson, 797 F.3d 934 (11th Cir. 2015), did away with any need for GDOC to persuasively explain why it cannot make the exact same accommodations made by other prisons. See Maj. Op. at 24–27. But the majority's reliance on Knight is misplaced. See id. & n.12. Knight was before our Court on remand for reconsideration in light of the Supreme Court's decision in Holt. See Knight v. Thompson, 796 F.3d 1289, 1291 (11th Cir. 2015) (per curiam). Notwithstanding Holt, the Knight panel held that Alabama's prison policy forbidding long head hair survived RLUIPA scrutiny because (1) Alabama prison officials, unlike those in Holt, gave articulable and detailed reasons why long hair would compromise security, and (2) it was not "apparent" that other prison systems actually permitted long head hair. Id. at 1292–93. In so holding, the Knight panel emphasized that the "persuasive reasons" burden from

38

Holt was satisfied because the District Court made detailed "factual findings concerning inmates' hair length" based on evidence presented by both parties. Id. at 1292. For example, the trial court in Knight found that "inmates can use long hair to alter their appearances," "inmates can manipulate self-searches of hair," and "permitting inmates to have long hair would make searches for contraband more difficult and more lengthy." Knight, 797 F.3d at 940.

In stark contrast, the District Court's findings here in Mr. Smith's case were resolved almost entirely against GDOC. Rather than finding, for example, that prisoners can "manipulate self-searches" of beards, the District Court's finding regarding searches favors Mr. Smith: "officers do not have to put themselves in danger to effectively search a beard." And many of the District Court's findings here addressed the total lack of evidence supporting GDOC. For example, the court said "GDOC offered no evidence showing that states that allow beards experience more . . . issues." Unlike in Knight, then, the District Court's findings do not support the conclusion that GDOC offered "persuasive reasons" for why it cannot allow untrimmed beards like the majority of other prisons. Also unlike in Knight, where the District Court said it was not "apparent" from the record that other prisons would allow long hair, 796 F.3d at 1293, this District Court found as a matter of fact that 37 states and the federal government allow full-length beards, either for all inmates or as a religious exemption.

39

GDOC is required to do more than articulate mere arguments for why Georgia is uniquely unable to manage untrimmed beards.  But that is all it did.  Even so, the majority allows GDOC to forbid prisoners from following the tenets of their religion requiring untrimmed beards.  I fear the majority opinion renders the Supreme Court's command in Holt meaningless, such that prisons in Alabama, Georgia, and Florida can now unjustifiably deny prisoners religious freedoms they would enjoy almost everywhere else in the country.

### B.

GDOC also failed to carry its stringent burden to "prove" that forbidding Mr. Smith from growing an untrimmed beard is the least restrictive means of furthering its compelling interest in prison safety and security.[3]  Holt, 574 U.S. at

---

[3] The majority opinion emphasizes the District Court's statements that "it is plausible that a beard of unlimited length could be much more difficult for GDOC to manage" and "it is plausible that allowing a close security inmate like Smith an untrimmed beard could be dangerous for prison security."  See, e.g., Maj. Op. at 15–16.  In doing so, the majority characterizes these statements as "findings" that are not clearly erroneous.  See, e.g., id. at 15.  Yet descriptions of what might or might not be plausible do not constitute findings of fact.

In any event, plausibility cannot carry the day at this stage in the litigation.  Plausibility is what is necessary to survive a motion to dismiss, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556–57, 127 S. Ct. 1955, 1965–66 (2007).  Mere plausibility cannot support a judgment after trial.  Instead, to obtain judgment under RLUIPA, GDOC must carry its burden to "prove" it cannot accommodate untrimmed beards.  Holt, 574 U.S. at 364, 135 S. Ct. at 864.  This means GDOC must show untrimmed beards are actually—not just plausibly—unmanageable.  I do not understand the District Court to have made any such finding.  Besides, to the extent the District Court's statement that GDOC had "offered persuasive reasons why it cannot allow untrimmed beards" does constitute a finding of fact, it is clearly erroneous.  It flies in the face of the utter lack of any record evidence showing Georgia's prisons face problems with untrimmed beards that do not exist in other prisons.  Perhaps this skilled and experienced District Judge characterized GDOC's offering as "plausible" in an effort to have the parties accept his compromise resolution of this dispute after a decade of litigation.

364, 135 S. Ct. at 864. The District Court found prisoners can hide contraband regardless of whether they have a beard and that contraband in beards does not pose a uniquely unmanageable risk. This finding was based in part on admissions from Mr. Holt and Mr. Angelone—GDOC's witnesses—that prisoners can hide contraband "[e]verywhere" and that "contraband in beards does not present different risks or dangers than contraband in clothes." And the court found that the evidence "persuasively indicates that officers do not have to put themselves in danger to effectively search a beard." Indeed, to the contrary the court found "the record shows that officers should use the safest method of searching," which is the "vigorous self-search" method used by the BOP and other states' prisons to search full-length beards. GDOC also failed to present evidence that beards are more likely than long hair to be grabbed and cause injury. It is a matter of record that GDOC permits long hair for female prisoners and staff. And the District Court credited Mr. Clark's testimony that allowing prisoners to practice their religion "helped prisoners develop themselves" and "made the environment safer." Indeed, my review of this record leads me to believe that forcibly holding Muslim prisoners down and shaving their beards presents more of a security risk to the guards than having prisoners search their own beards. Beyond that, this record is devoid of evidence that allowing untrimmed beards would lead to jealousy on the part of non-Muslim prisoners, gang identification among Muslim prisoners, or

41

hygiene problems for those with untrimmed beards. For example, Muslim prisoners can already identify themselves by wearing kufis, yet GDOC offered no evidence of gang affiliation or jealousy problems in this regard. Finally on this point, the record also reflects that untrimmed beards can be inspected for health reasons during regular haircuts, and Mr. Smith testified that his religion requires keeping his facial hair neat and clean.

The majority opinion never explains how the District Court findings on safety and security are clearly erroneous. Rather, the majority says these are not the relevant findings to consider when evaluating Mr. Smith's request to grow an untrimmed beard. Maj. Op. at 22 & n.10. Because the District Court makes these findings in the section of its Order ruling that a three-inch compromise is appropriate, the majority says, we cannot consider those findings when considering whether Mr. Smith can have an uncut beard. Id. To be sure, the District Court made some of these findings in arriving at its compromise three-inch solution, but our obligation to consider a factual finding does not disappear once we reject the remedy crafted by the court. The testimony on which the District Court based its findings was given on the topic of untrimmed beards. In finding GDOC failed to demonstrate that beards posed problems with contraband, searches, or violence, the District Court relied heavily on the testimony of Mr. Clark who spoke to his experience in the BOP which allows untrimmed beards. As one specific example,

42

the District Court found GDOC could adopt the self-search method used by the BOP on untrimmed beards.

Indeed, it is the majority's opinion that "focuses on the wrong part of the record." Maj. Op. at 22 n.10. To support its conclusion that GDOC met its stringent burden to prove it cannot accommodate untrimmed beards, the majority relies on testimony from GDOC's witnesses that untrimmed beards raise concerns about prisoners "hiding contraband," "altering their appearance to avoid identification," and "injuring each other by grabbing beards during altercations." Id. at 17. But the District Court systematically rejected this evidence. After considering the very testimony relied upon by the majority, the District Court found: (1) "GDOC has failed to demonstrate why beards would pose a contraband problem if they were searched along with head hair"; (2) "GDOC's concerns about identifying inmates could be addressed by enforcing the [photo] policy that GDOC already has and making improvements"; and (3) GDOC's testimony "that a beard can be grabbed and cause injury to an inmate" appeared "speculative" because "beards longer than a half-inch are not allowed by GDOC inmates" and GDOC's witness "provide[d] no basis for this opinion." The majority opinion never rejects these findings as clearly erroneous. Rather, the majority takes on the role of fact finder—digging through testimony to support its own fact-finding, while shunning

43

the facts actually found by the District Court.[4]  It is not the proper role of the court of appeals to reweigh evidence for itself simply because it does not like the findings made by the District Court.

The evidence and the corresponding findings by the District Court lead to only one conclusion: GDOC failed to meet its burden under RLUIPA to prove that it cannot accommodate untrimmed beards.  GDOC should therefore be ordered to allow Mr. Smith to maintain the uncut beard dictated by his faith.  Because today's decision ignores GDOC's absolute failure of proof, Mr. Smith will continue to be forced to violate his religious beliefs by cutting his beard.

## III.

Even though I believe the District Court should have ordered GDOC to permit Mr. Smith to grow an untrimmed beard, I will also address the prospective relief actually awarded in this case.  In addition to holding that GDOC's half-inch beard policy violates RLUIPA, the District Court ordered GDOC to modify its statewide grooming policy to permit beards up to three inches in length.  The

---

[4] The majority says the District Court resolved these factual issues in favor of GDOC but, again here, all the District Court said was "it is plausible that a beard of unlimited length could be much more difficult to manage" given its ability to cause harm, hide contraband more easily, and disguise a face.  Of course, GDOC's witnesses testified that untrimmed beards would be unmanageable in those ways.  But as I set out above, when the District Court considered this testimony in light of the rest of the record, it systematically rejected it as "speculative," having "no basis," or constituting a "fail[ure]" of proof.  While it may be true that evidence can be "persuasive for one reason and not for another," Maj. Op. at 23, evidence cannot be "speculative" or have "no basis" for one assertion and not for another.

majority opinion vacates this portion of the District Court's Order.  Maj. Op. at 15.

According to the majority, the three-inch remedy is inappropriate because Mr.

Smith never requested it.  Id. at 11–15.  However, a review of the trial record

demonstrates GDOC was fully aware that permitting Mr. Smith to grow a three-

inch beard was a possible resolution of the case.

Far from containing only "stray references" to a three-inch alternative, this

record demonstrates everyone was aware that a policy permitting three-inch beards

was an available alternative remedy.  See id. at 13.  The District Court understood

the three-inch alternative to be consistent with Mr. Smith's deposition testimony

that his religious beliefs meant that, if he must cut his beard, "it has to be no

[shorter] than a fistful in length."[5]  And GDOC was obviously on notice that a

three-inch remedy was a possible outcome here.  In its summary judgment

briefing, GDOC expressly disputed that permitting fist-length beards was a

reasonable alternative.  It also addressed this issue at trial.  GDOC's witness

explained that GDOC had "concerns with beards that may be limited to three or

four inches[.]"  GDOC's witness also testified that "[c]ontraband can be easily

hidden in those [three- or four-inch] beards" and provided examples.  I can think of

no reason why GDOC would refute the feasibility of a three-inch beard as an

---

[5] The District Court found, consistent with the findings made by courts in similar cases, that "fist-length" translates to three to four inches.  I do not understand GDOC to dispute this finding.

alternative unless it knew that alternative was a potential remedy.  Just because neither party is happy with the District Court's ruling doesn't necessarily mean it's wrong.

*   *   *

Mr. Smith is sentenced to spend the rest of his life behind bars.  As a result of today's decision, he will live out his life in a manner that fundamentally violates the tenets of his religious beliefs.  This profoundly flawed outcome is all the more tragic because it relies on little more than speculation offered by his jailers about the problems untrimmed beards could cause.  If he were in almost any other facility in our country, Mr. Smith would not be forced to live this way.  But because he is incarcerated within our Circuit, he has no relief for this egregious violation of his religious rights.

I respectfully dissent.